THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLEVE HEIDELBERG, Defendant-Appellant.

(No. 71-197; 

Third District—November 13, 1975.

James Geis, of State Appellate Defender's Office, of Ottawa, for appellant.

578

Michael Mihm, State's Attorney, of Peoria (James Christy, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

On June 10, 1970, defendant was indicted for attempted armed robbery and for murder of Sergeant Raymond Espinoza of the Peoria County Sheriff's Department. The officer was shot in the head when he officially interrupted the progress of an attempted armed robbery at the Bellevue Drive-In Theatre westerly of Peoria on May 26, 1970; he died instantly of the wounds. Defendant indicated to the court that he was indigent and was thereafter at various times represented by several different court appointed counsel and also at times, *pro se*, as hereinafter detailed. A four-week trial commenced November 16, 1970, and on December 15 verdicts were returned finding defendant guilty of all charges. After post-trial motions were heard and denied on January 25, 1971, judgments were entered on the verdicts, and defendant was sentenced to the Illinois State Penitentiary for consecutive terms of not less than 10 years nor more than 14 years for the attempted armed robbery and of not less than 99 years nor more than 175 years for the murder. The court advised defendant of his right to appeal but neglected to advise him as to the time within which notice of appeal was required to be filed, in accordance with Supreme Court Rule 605 (Ill. Rev. Stat., ch. 110A, § 605). No notice of appeal was filed within 30 days of January 25.

On February 23, 1971, defendant filed, *pro se*, a petition under section 72 of the Civil Practice Act (Ill. Rev. Stat., ch. 110, §72) to vacate the conviction and sentence and for a new trial. On December 2, 1971, defendant filed in this court a *pro se* motion dated June 16, 1971, for leave to proceed with an appeal from the conviction order entered January 25, 1971, together with a proposed notice of appeal supported by affidavit tending to show excusable neglect. He also filed a motion for appointment of counsel to prosecute the appeal. Later the section 72 petition was dismissed by the circuit court on April 25, 1973. On May 7, 1973, defendant filed, *pro se*, a notice of appeal from the said final order entered April 25 "in a proceeding under section 72 * * *" and asked appointment of counsel. The appellate defender was appointed counsel on this appeal also, and has filed a 56-page brief on defendant's behalf. In addition, defendant has filed, *pro se*, another brief of 76 pages. The State has responded to both. It is apparent from the briefs of all parties, and the issues argued, that all parties consider the scope of this "consolidated appeal" to involve a direct review of the record of conviction as well as a review of the order dismissing the section 72 petition.

■■ In the absence of any objection by the State to a consideration of the issues raised on direct review of the conviction and sentencing order entered on January 25, 1971; and considering that defendant was indigent and that the trial court did not advise him of the time within which notice of appeal was required to be filed;[1] considering also that the case has been fully briefed and argued, and that a request for leave to file late notice was made, even though filed after the expiration of 60 days; we have elected without meaning to establish precedent (*cf. People v. Sweeney*, 114 Ill.App.2d 81 (2nd Dist. 1969)), that we will not dismiss *sua sponte*. (See *People v. Williams*, 59 Ill.2d 243, 320 N.E.2d 13 (1974); *People v. Brown*, 54 Ill.2d 25, 294 N.E.2d 267 (1973).) Accordingly, rather than to put defendant and the State to the expense and delay of exercising a different remedy (*People v. Scott*, 43 Ill.2d 135, 251 N.E.2d 190, 194 (1969)), we shall consider in this consolidated appeal the merits of all issues raised which the records of the separate causes preserve.

A discussion of the evidence given at the criminal trial is essential for an understanding of the section 72 petition and of how some of the other issues arise.

At 1 a.m. on May 26, 1970, a film showing was nearing completion at the Bellevue Drive-In Theatre. Twenty-year-old Maurice Creemans, a projectionist, was on duty in the projection booth with Mrs. Mayme Manuel, the theatre manager, who at the time of trial was 78 years of age.[2] The room was lighted by a 100-watt bulb, another 15-watt bulb,

---

[1] The court's failure in this respect derived from the confusion interjected in the record by defendant on the question of whether, at the time, he was or was not represented by retained counsel. Defendant filed *pro se* several instruments indicating that Kunstler, Sussman and Vieley were presently retained. Kunstler and Sussman never entered an appearance. Vieley had been discharged as court appointed counsel at the sentencing. Defendant later filed an instrument disavowing Vieley as counsel, and then later withdrew that instrument, filed *pro se*, and later retained attorneys Bolder and Vieley, and after that applied here for appointed counsel. We have elected to give defendant the benefit of the doubt, however, since it is not clear that he actually had representation during the period required for notice of appeal.

[2] At the time of trial, Mrs. Manuel was in poor health and had been hospitalized for conditions unrelated to this proceeding. She was brought to court by ambulance and testified from a stretcher, and was returned to the hospital after testifying. In *Illinois v. Allen*, 397 U.S. 337, 25 L.Ed.2d 353, 90 S.Ct. 1057, Justice Black, writing for the court in respect to considerations appropriately considered by trial courts in dealing with defendants bent on disrupting proceedings, said it must be recognized that such a defendant "might conceivably, as a matter of calculated strategy, elect to spend a prolonged period in confinement for contempt in the hope that adverse witnesses might be unavailable after a lapse of time." 397 U.S. 337, 345, 25 L.Ed. 2d 353, 360, 90 S.Ct. 1057, 1062.

and by light shining from the lamphousing of the projector. A ticket booth or box office was located at the entrance drive.

Creemans and Mrs. Manuel both testified that about 1 a.m., a man came to the window of the booth and mumbled something neither could discern. Creemans directed him to go to the men's restroom from which a door opened into the booth. When Creemans opened that door, the light from two 60-watt bulbs in the restroom added further illumination to the form of a Negro male, 6 feet tall, weighing about 175 lbs. and wearing a grey sports coat, dark pants and a light blue shirt. The man asked that Sonya Jackson be paged. When no one answered the page, the man drew a silver-barreled gun, saying, "This is a stick up, I am not fooling, I'll kill you." The gunman continued to hold his weapon on both Creemans and Mrs. Manuel for 15 minutes until the show was completed at 1:17 a.m. He then tied Creemans with speaker wires and, leaving him tied on the floor, dragged or pulled Mrs. Manuel across the parking ramps to the box office where he demanded money. Thirty to sixty seconds after Creemans had been left tied, he freed himself, and after calling the sheriff, waited in the booth for police to arrive.

Jerry Lucas, an ex-convict who was employed as a paid informer for the Peoria County Sheriff's Department testified that he was riding as a passenger in the squad car with Sergeant Espinoza when the latter received the call that an attempted robbery was in progress at the Bellevue. He testified that when they entered the theatre drive, he saw a woman with her hands in the air standing beside a parked blue car and a man nearby. As they approached closer, he saw the man run toward the sheriff's car and fire from a distance of 10 feet. Sergeant Espinoza slumped in his seat; Lucas threw himself to the floor and the police car crashed into a wall. As he was running toward the sheriff's car, said Lucas, the headlights shown on the gunman and he could clearly see the man's face and recognized him as defendant whom Lucas said he had known for 10 years. After the squad car crashed, Lucas drew Espinoza's gun to protect himself, according to his testimony, and radioed for help. He gave a description of his own clothing so he would not be mistaken for the assailant. He saw defendant drive off with the woman. There was evidence that Espinoza's gun had not been fired, and that no other weapon was found on Lucas.

City and county lawmen dispatched to the area quickly picked up the trail of defendant's automobile, and after a high-speed chase through the streets of Peoria it finally crashed into a parked automobile while negotiating a turn at an intersection. Mrs. Manuel was found in the automobile and was removed to the hospital; a lone gunman was seen fleeing the area on foot. With the help of a canine unit, defendant was

apprehended a short time later standing in the dark on the rear porch of a house not far from his abandoned automobile. He was bleeding from an injury over the eye, was sweating and breathing heavily. A silver-barreled .38 revolver was found in his car. He was wearing a grey coat, light blue shirt and dark denim pants. Creemans, Mrs. Manuel and Jerry Lucas positively identified defendant at the trial as the man who committed the crimes. Several police officers who engaged in the pursuit of defendant's automobile positively identified defendant as the driver.

At the conclusion of the State's case, defense testimony began in support of the alibi that defendant at the time of the alleged crimes was at the TT Club and Dimp's Place in Peoria. Junius Whitt was a principal witness who testified that during the late evening hours of May 25 and the early morning hours of May 26, he had been with Lester Mason, Matthew Clark, Mike Biehl "and a person known as Curtis Smith." They had defendant's auto which Mason had borrowed from defendant. Whitt testified that said Smith had instigated a plan to rob the drive-in but that Matthew Clark, Biehl and he dropped out of the plan, and let Smith take defendant's car. Whitt said that he loaned to said Smith his silver-barreled .38 revolver which was the one later recovered from defendant's wrecked automobile. Whitt testified that at the time of the occurrence, he lived about 4 or 5 blocks from the intersection where the chase later ended, and that he was awakened *shortly after 2 a.m.* on May 26 by said Smith's pounding on the door. When he let him in, Smith was dirty, said Whitt, and was out of breath and made a couple of quick telephone calls asking for Lester Mason and saying "things didn't turn out right," and "talked in riddles." Whitt said Smith also told him that he had lost the .38 revolver but would replace it. Smith spent the night with Whitt, according to the latter's testimony, but left at 5:30 a.m., and had not been seen by Whitt since. Whitt said Smith was wearing dark bell-bottom pants, a yellow and green shirt and a light jacket. Whitt admitted to a previous felony conviction for burglary. He also testified that Smith at that time had not lived in Peoria except for a day or two and that he did not know how he knew about the drive-in. On several matters pertaining to the acquisition and sale of weapons, he refused to testify, claiming fifth amendment rights.

Thomas McLain testified that he arrived at the TT Club about 11:30 p.m. on May 25; that he saw Lester Mason and Matt Clark in defendant's car in the parking lot; when he went inside he saw defendant there, they had a beer and left together about 12:30 a.m. to look for defendant's car. They went to Dimp's place he said, and not noticing it there, returned to the TT Club about 12:45. Around 1 a.m., at closing time for the TT Club, McLain said that he, defendant and Leon Hays walked out

together and stood visiting about 5 minutes. Defendant asked to be dropped off at Dimp's. McLain said further that they dropped defendant off at Dimp's about 1:10, that they went to the Blue Shadow for an hour and afterwards came back to Dimp's where they saw defendant outside. Defendant asked them for a ride, and they dropped him off near the Butternut Bakery, which apparently was located near the intersection where defendant's automobile had been abandoned. McLain also testified that he saw Lester Mason and Matt Clark outside the TT Club. But as to Curtis Smith, he said he didn't "know who he is—by that name."

Jay Van Russell testified for defendant that in the early morning hours of May 26 he was working at "Dimp's," which is an after-hours establishment in Peoria, and that he saw defendant there about 1:15 a.m. playing pool and that defendant remained there *until 1:40 a.m.* Lester he said he didn't know whether defendant played pool. He also testified defendant asked to borrow his car. He also stated, however, that when defendant was leaving, Matthew Clark and Lester Mason came to the door, and that this would have been approximately 1:20. The inference argued from this testimony was that Mason at the time of this meeting with defendant had already spoken with Smith in the telephone conversation the latter supposedly placed from Whitt's house, and communicated to defendant the location of defendant's wrecked automobile. The validity of that version, however, was substantially diminished by the conflict in times given by the defense witnesses. Whitt had said Smith called Mason *after 2 a.m.*, while Van Russell said that Mason and defendant visited outside "Dimp's" at 1:20 a.m. and that defendant *left at 1:40 a.m.* The jury could find that the alibi testimony and the alleged involvement of a "Curtis Smith" by any name was a pure fabrication.

Leon Hays testified for the defense substantially as McLain, but added that when they arrived in the area of the bakery where defendant was let out, he observed police cars in the general area. He had no recollection of having seen Lester Mason, Junius Whitt or Matt Clark at the TT Club. He attempted to avoid cross-examination by requiring the prosecutor to repeat questions three or four times; to define terms like "morning," "noon" and "afternoon"; by referring to the prosecutor as "boy," and answering ultimately that he couldn't remember and that the prosecutor "ain't gonna make me remember." When asked whether he'd worked the day before, Hays responded, "I told you I am on vacation. I am subpoenaed. Any other little tricks."

Charles Bloomfield and Sharon Ford also testified they had seen the defendant at the TT Club at closing time. The TT Club bartender testified that he had seen defendant there some time during the evening but could not recall that defendant was there at closing time.

Defense witness, Matthew Clark, refused to answer any questions under his rights against self-incrimination. Lester Bobby Mason appeared by writ of *habeas corpus ad testificandum* addressed to the warden of Stateville at Joliet, but invoked the Fifth Amendment as to most questions admitting only to his height and weight, that he had been convicted of "quite a few" felonies, and had been at Stateville for 6 months. "I will tell the judge and jury one thing," he said, "that I remain with the Fifth."

We find no merit in the appeal from the order dismissing the section 72 petition. While that petition alleged fraud, deception and suppression of evidence by the State as to the identity and whereabouts of Curtis Smith, who was really James Clark, those allegations as to fraud, deception and suppression are entirely unsupported by the record or by the contents of any supporting affidavit, as required by section 72(2). The affidavits filed in support of the petition are executed by defendant himself, who exercised his right not to testify at the trial. While one of the affidavits executed by defendant states that Lester Mason related to him that the States Attorney's office and sheriff had threatened him should he reveal the real identity of "Curtis Smith" as being James Clark, and that Mason is now willing to so testify, it is apparent (1) that defendant could not competently testify to the truth of such facts; (2) that all said facts, if true, were known to Mason at the time of trial; (3) that Mason invoked the Fifth Amendment at the trial and refused to testify; and (4) that Mason himself has given no supporting affidavit that he would testify at a new trial as to any of the facts defendant asserts. Other supporting affidavits were given by defendant's attorney, Jack Vieley (who merely recites his pretrial unsuccessful efforts to locate "Curtis Smith"), and by T. B. McLain (who merely reaffirms the testimony he gave at the trial), and by James Clark as to his alias, Curtis Smith, and that he committed the crimes. None of the affidavits support allegations of perjury, fraud, deception or suppression on the part of the State, nor do they show that the defendant and Mason would testify at a new trial as to matters they refused to testify to at the original trial. The State filed an affidavit of John Stenson, a Peoria police officer, that he has personally known defendant, Matthew Clark and James Clark about 20 years, that the Clarks are brothers, and that all three of said individuals have been personally acquainted with each other since their childhood.

■■■ It was appropriate that the petition be decided on the basis of the affidavits alone (*A. C. Allyn & Co. v. Tager*, 78 Ill.App.2d 228, 223 N.E.2d 405 (1st Dist. 1966)). The law also contemplates that the section 72 petition should be heard by the same judge who rendered the original judgment which the petition collaterally attacks, since he would

have better knowledge as to whether the new facts alleged would have prevented rendition of the judgment attacked (*People v. Mamolella*, 42 Ill.2d 69, 245 N.E.2d 485 (1969)). Moreover, the record shows that defendant himself called the petition for hearing before Judge Iben who had entered the judgment of conviction. Being aware of the many witnesses, including some who had known defendant for many years, who positively identified defendant as the gunman, the circuit judge did not err in concluding that a confession by James Clark would not have prevented rendition of the judgment against defendant.

In *People v. Sheppard*, 405 Ill. 79, 90 N.E.2d 78 (1950), it was held that neither the common law writ of error *coram nobis* nor its statutory substitute in section 72 of the Civil Practice Act were designed as means for correcting alleged false testimony or for procuring a new trial on the basis of newly discovered evidence. In *Williams v. People*, 31 Ill.2d 516, 202 N.E.2d 468 (1964), a prisoner obtained an affidavit from his brother that it was the brother who committed the crime of which the prisoner was convicted. The prisoner attached this affidavit in support of his petition under section 72. The court said in that case that the writ of *coram nobis* does not lie for newly discovered evidence. The court also made note that the record disclosed in that case, as is true in the case at bar, that defendant was positively identified in lineups and at the trial by a person who was an acquaintance of defendant. Under that circumstance the newly proferred fact of a confession by another, alleged to have been recently discovered or obtained, would not have prevented rendition of the judgment.

For an understanding of the issues raised on appeal from the conviction, it is necessary to discuss some of the procedural aspects of this case.

On July 6, the public defender's office was relieved of its obligation to represent defendant on the latter's *pro se* motion, and Joe McDade and James Hafele were appointed counsel. Two days later, these two attorneys were relieved of their appointments on defendant's *pro se* motion to represent himself. The day following the order allowing defendant to represent himself, defendant filed a *pro se* motion asking appointment of Jack C. Vieley as cocounsel with James Hafele. This motion was allowed. The record shows that these attorneys devoted considerable time in the preparation of the defense including motions and lengthy hearings to dismiss the indictment, to suppress lineup identification, and for considerable discovery. They were aided by investigators from the office of the appellate defender who interviewed witnesses.

The cause was originally set for hearing on July 20 and on defendant's motion was reset for July 27, and later for September 14, and thereafter a continuance was requested from the September 14 setting and the

cause was reset for October 19. On September 2 and 4 defendant filed a *pro se* motion for self-representation. At the hearing on these motions the question of defendant's competency to knowingly and willingly waive counsel was raised, and on October 7 Mr. Hafele, over defendant's protest, filed a motion for a competency hearing of the very same kind which defendant was later to file again on November 18 when he was obviously attempting to force a continuance of the trial.

At the time the October 7 competency petition was filed, a previous order had been entered on defendant's motion transferring venue to Knox County. Subsequently a stipulation was filed that all nonjury matters should be heard in Peoria. On October 29, defendant filed a waiver of jury on the competency hearing, and on the same day, after hearing by the Peoria County Circuit Court, defendant was found competent.

At the conclusion of the competency hearing defendant and his attorneys requested that the place of trial be changed from Knox County back to Peoria County. That motion was allowed. The court then inquired of defendant whether he wished to persist in his motion for self-representation. When defendant responded affirmatively, the court admonished defendant as to his rights, in compliance with Supreme Court rules, and also advised defendant as to difficulties he should anticipate by reason of his incarceration. When defendant persisted in his motion the court allowed it and granted Messrs. Hafele and Vieley leave to withdraw. In granting defense counsels' motion however, the court stated in respect to Mr. Vieley "that * * * [he] * * * will be retained in this capacity, [to wit], he will be, at all times, ready to resume his role to defend * * * [the accused] * * * if, at any time, * * * [the accused might] * * * so desire * * * [and] [in] addition, when this case goes to trial, Mr. Vieley will be present in the courtroom and at any time should * * * [the accused] * * * want him, to take over this case as counsel * * * [it will be permitted]." Defendant, *pro se*, and the State agreed to a trial setting for November 16.

On the following day, October 30, an order was entered allowing defendant's *pro se* motion to have Mr. Vieley "appointed to counsel with the Defendant at the Defendant's request and to provide the Defendant with research material and other items necessary to the Defendant to enable him to conduct his defense."

On November 12, the State made an oral motion to continue the trial setting from November 16 to November 23. That motion was denied *on defendant's pro se objection* to a continuance. On Friday, November 13, however, defendant filed a *pro se* motion for continuance with notice of hearing set for Monday, November 16.

Before the first prospective juror was called on November 16 there was a lengthy hearing on defendant's demand for a private telephone line in his cell. Jail regulations had already been considerably relaxed in order to help defendant with his *pro se* representation. The motion was denied, however. Defendant also made several additional motions for continuances and when all of these were denied, he then objected to any further proceedings on the grounds he could not get a fair trial in Peoria, that any attorney from Peoria who might wish to represent him in Peoria could not adequately and effectively do so because of prevailing animosity and prejudice, that he felt inadequate to represent himself as a layman, and because the court's order overruling the request for continuances was a great handicap. The defendant then began shouting and pounding on the counsel table insisting that he would not be silent, that he was being railroaded, that the judge was not a fair judge, that he would not obey the court's directive to sit down or to be silent, that denial of his motion for continuance was denying him a fair trial. Outbursts were heard from spectators. Every effort to proceed with the *voir dire* of prospective jurors who had been called to the box was interrupted by defendant's objections despite warning from the court that the case would proceed even should it become necessary to shackle and gag him, or to remove him from the courtroom. Defendant continued his objections exclaiming that he could not adequately represent himself and had been taken unfair advantage of by the court's adverse rulings on his motions, that the court was prejudiced and had no intention of fairly judging him, that he would not let the court railroad him "in no ways, in no respect," and that he had a right to continue interjecting his objections to any proceeding with which he did not agree. The prospective jurors were removed while the State recommended to the court that defendant be temporarily placed in the county jail while facilities be arranged for him to listen and communicate *in absentia* until he should indicate his desire to come back and conduct himself in an orderly fashion, and that attorney Jack Vieley be reappointed to defend him. Defendant objected "violently" that he could not get a fair trial with the use of any attorney in Peoria *or the State of Illinois*, that he had a nonresident attorney who would come to Peoria (*i.e.*, William Kunstler), and needed adequate time, that the court had taken unfair advantage of him two or three times and was prejudiced and had no intention of judging him fairly. The court ordered defendant removed to the county jail, and that electronic installations be made so that defendant could hear the proceedings from another room. The proceedings were adjourned for the day.

The following morning, November 17, defendant appeared in court

with Mr. Vieley and presented a copy of a petition for *habeas corpus* and removal, which had been filed that morning for defendant in the United States District Court, Southern District, at Peoria, under provisions of 28 USCA §§ 1443 and 1446. Defendant argued that the filing of a copy of the Federal petition with the circuit clerk effected a removal of the cause to the Federal court and deprived the State court of jurisdiction "unless and until the case is remanded." The circuit court determined that the pending State proceedings were *not* within the class of cases to which the Federal statute pertained, and ordered the proceedings to continue. The court then began to question a prospective juror and at the conclusion of this examination excused him for cause on defendant's motion. Another prospective juror was called and before the court began an examination *as to his qualifications, defendant was on his feet objecting persistently to further proceedings. The court ordered that the jury be removed and while they were leaving defendant, addressing the court, stated: "All this is just a railroad, you are sitting on this bench, you are supposed to be a judge or somebody behind the desk, but you are not—all this is just a railroad." And after the jury was out, defendant continued addressing the judge: "And you have hopes that I keep my mouth shut and go ahead and go to the electric chair. I have valid reasons why I have asked a continuance, I have an attorney, an effective attorney  *  *  *." Defendant continued this insolent theme despite the court's warning that it intended to enforce its ruling that the cause proceed. Finally, the court ruled that defendant had forfeited his right to defend himself *pro se*, and ordered him removed to an adjoining consultation room where installations had been made whereby he could hear the proceedings and communicate with Mr. Vieley whom the court appointed as defense counsel over defendant's objection. The court also advised defendant of his rights and the importance of his being personally present and told him he could return to the courtroom at any time he might indicate a willingness to submit to court rulings, and that any time that different counsel should appear for him and be qualified, such counsel could take over the defense. Defendant continued, "I have an attorney *and I am securing a delay  *  *  *  until he can get here* and enter his appearance  *  *  *. The defendant stand[s] here representing himself pro se, he believes that he would have the right to represent himself, he believes that he do not have to be removed from this courtroom." (Emphasis added.) He was removed shouting and struggling against the efforts of five deputies.

After defendant's removal, Mr. Vieley objected to his appointment as counsel upon the grounds that defendant had repeatedly voiced his

desire to be represented by Mr. Kunstler and not by him, and that in his own view, defendant had a right to retain counsel. He also asked for a 3-day continuance until the next Friday so the Mr. Kunstler could appear. The court denied the motion on the grounds that it could only speculate as to whether Kunstler would appear, that substitution of counsel on the morning of trial or in the middle of it is not usually allowed except under special circumstances, and that the court was appointing Mr. Vieley only because there is no one more capable or knowledgeable of the case, and because Mr. Heidelberg had accepted him as counsel when the cause was set for trial. During the rest of the morning, the *voir dire* examination by the court continued and several prospective jurors were excused for cause on stipulation. No jurors were sworn.

After a luncheon recess, defendant was permitted to return to the courtroom on his request, and the State placed into the record a certified copy of an order executed November 17, 1971, by Robert D. Morgan, United States district judge for the Southern District of Illinois, denying defendant's Federal petition for *habeas corpus* and removal. Mr. Vieley's oral motion for a mistrial was denied. Mr. Vieley then moved that defendant be allowed to proceed "pro se." The motion was denied. He then filed two motions, one for a 3-day continuance and one for a substitution of judges on the grounds of prejudice. The motion for continuance alleged that defendant does not want to be represented by Vieley and has been able to secure attorney Kunstler to represent him but that the latter cannot appear until November 20, 3 days hence. The court refused to reconsider either motion. The proceedings adjourned that day with no jurors having been sworn.

On November 18, the State's motion for revocation of previous orders relaxing jail regulations for defendant was allowed.[3] Thereafter, Mr. Vieley filed the second motion for a sanity hearing for defendant. The argument in support of that motion was to the effect that defendant felt emotionally and mentally frustrated because he could not understand the processes of the court or its decisions and was anxious and depressed. The motion was denied. Thereupon Mr. Vieley filed defendant's *pro se* motion for self-representation and asked that defendant be permitted to argue the same. That motion was denied, whereupon defendant got up from his seat and walked out of the courtroom without restraint, and took

---

[3] The record indicates that during the period the defendant represented himself *pro se,* orders had been entered relaxing jail rules and regulations and giving defendant access to a telephone in his cell. The judge received during one night eight threatening calls, and one where no one spoke, but declined to impute responsibility for such calls to anyone involved in this case.

a place in the consultation room where the electronic communication system was reactivated. The *voir dire* continued. On the afternoon of November 19, 1970, at the urging of the court, defendant returned peaceably to the courtroom and remained there for the duration of the trial. The *voir dire* continued through November 30.

■■ Defendant claims that it was denial of due process, when he was incarcerated and representing himself, for the circuit court to have denied his request filed November 13, for a 60-day continuance of the trial from November 16 where the record shows that he had received, only 18 days before the trial setting a list of 70 State witnesses and a substantial portion of the State's discovery.

The reference to a substantial portion of the State's discovery appears to refer to the 3½-inch stack of documents delivered to defendant by the State on October 30.[4] We reject defendant's claim of error, however, since the record shows that on October 29, defendant, *pro se*, and the State agreed upon a trial setting of November 16 and there had been many previous continuances at defendant's request. On November 2, the State provided defendant a formal list of 62 witnesses most of whom, according to the record, were already identified in documents previously forwarded to the defense by the State. While the 3½-inch stack of material furnished defendant on October 30 appears to have contained some new matter, including transcripts of police tapes made on May 26, the record indicates that most of the material had been previously furnished. The record does not disclose the content of the police tapes or that defendant was prejudiced in any manner by their late delivery. We decide under this record that the case of *People v. Holmes*, 12 Ill. App.3d 713, 298 N.E.2d 738 (4th Dist. 1973), is controlling. It was held in that case that a motion for continuance called for hearing on the first day of trial on March 29, 1971, on the grounds that the State had furnished a list of 44 witnesses as recently as March 26 was correctly denied in the circuit court's discretion where the record showed that most of these witnesses' names were contained in documents furnished by the State many weeks before. Moreover, on November 12, the State in the case at bar made an oral motion to the court for a continuance of the trial setting from November 16 to November 23. That motion was denied *on defendant's pro se objection to a continuance*. Under all

---

[4] In this connection the State has filed a motion, taken with this case, to supplement the record on appeal with an affidavit of the assistant State's attorney to the effect that that 3½ inches of material was not newly furnished matter. We sustain defendant's objections to this motion. The record on appeal may not be supplemented by documentary evidence which was never a part of the original record in the circuit court.

these circumstances, we find no merit in the contention that the court abused its discretion or denied due process by refusing on the morning of the trial call to grant defendant's motion for a 60-day continuance. It is apparent from the record that defendant at the time he persisted in his motion for self-representation was made well aware of the difficulties this would entail because of his incarceration. It also appears from other *pro se* motions filed by defendant on November 16 and 17, that even though he persisted in a motion to represent himself, defendant considered himself unqualified to do so and that the main purpose of his motion was not to acquire additional time for him to prepare his own defense, but to stall and delay the proceedings until a recently inspired expectation that Mr. Kunstler would come and defend him might be realized. Mr. Kunstler never appeared. The facts here are entirely different than those in *People v. Crump*, 5 Ill.2d 251, 125 N.E.2d. 615 (1955), *People v. Kenzik*, 9 Ill.2d 204, 137 N E 2d 270 (1956), and *People v. Brown*, 13 Ill.App.3d 277, 300 N.E.2d 831 (1st Dist. 1973), upon which defendant relies.

No error was made in delaying the ruling on defendant's September motions for self-representation until October 29. Under Supreme Court Rule 401 (Ill. Rev. Stat., ch. 110A, § 401), the court may not permit a waiver of counsel by an accused until it determines that defendant understands the nature of the charge, the maximum and minimum penalties prescribed by law, and his right to have counsel appointed for him if he is indigent. In *People v. Bortnyak*, 39 Ill.2d 545, 237 N.E.2d 451 (1968), it was stated that where facts are brought to attention of the court either by way of suggestion of counsel or the State, or by its own observation, which raise a *bona fide* doubt of defendant's sanity, the duty devolves upon the court to then cause a competency hearing to be held. The question of defendant's competency had been raised here both by the State and by Mr. Hafele, as defense counsel. Under the circumstances of this record and especially considering defendant's own subsequent claim of incompetency on November 18, we think the circuit court acted wisely in deferring the ruling on the self-representation motion until after the question raised as to defendant's competency had been resolved. Considering that defendant had obtained an order changing venue to Knox County except for nonjury matters, and that his counsel did not file a waiver of jury on the competency issue until October 29, the circuit court acted promptly on October 29 in granting a hearing and adjudicating defendant to be competent and in allowing him on the same day to proceed *pro se*.

The recent case of *Faretta v. California*, 422 U.S. 806, 45 L.Ed.2d 562, 95 S.Ct. 2525 (1975), has been additionally cited by defendant in

support of his claim that he had a constitutional right to represent himself in these State court criminal proceedings and to have counsel of his choice, which the circuit court abridged. In *Faretta*, the defendant many weeks before trial declared that he wanted to represent himself and was consistent in his representation that he did not want counsel. Defendant's constitutional rights to counsel and self-representation in the case at bar were never ignored but were frequently expressly acknowledged by the circuit court. The problem that confronted defendant was his own ambivalence. He requested counsel until it was furnished. Then he withdrew his requests and asked to represent himself. That being allowed, he reverted to a motion for appointment of counsel again, and being given that, asked the opposite. The designation of Mr. Kunstler as counsel of his choice came only after the cause was called for trial.

In *United States v. Dujanovic*, 486 F.2d 182 (9th Cir. 1973), it was held that an accused has a constitutional right to competent counsel and also a constitutional right to represent himself, *pro se*, but that the two constitutional rights may not actively coexist. And a defendant who knowingly and voluntarily waives his right to counsel, even though he has assistance of counsel in an advisory capacity, cannot be heard to complain that his *pro se* representation prevented him from receiving effective representation of counsel. (*People v. Lucien*, 14 Ill.App.3d 289, 302 N.E.2d 371 (1st Dist. 1973).) Where a prisoner in custody knowingly and voluntarily elects to manage his own defense, he relinquishes many of the traditional benefits associated with the right to counsel. The constitution does not require in the case of a prisoner who elects to represent himself *pro se* that he be exempted from regular jail procedures and searches, and no duty exists, where such facilities are not commonly available in a common jail, to provide him law books, or private telephones, or unlimited access to witnesses, investigators or other items he may feel necessary. By electing to represent himself, a prisoner in custody may not expect favored and privileged treatment even though the result may be that he is less effective as his own attorney. Although not required to do so, and while in many instances it could present real security risks, the circuit judge in the case at bar attempted to increase defendant's *pro se* effectiveness by many orders relaxing jail rules and providing special privileges including a telephone in his cell, an advisor lawyer to furnish books, and special mail and special visitor privileges. In approving this procedure here, where no previous guidelines existed, we do not intend to establish any precedent for such requirements.

In *United States v. Theriault*, 474 F.2d 359 (5th Cir. 1973), *cert. denied*, 411 U.S. 984, 36 L.Ed.2d 960, 93 S.Ct. 2278, it was held that

where a defendant sought to represent himself, but the judge, from his prior experience with defendant's propensity for courtroom disruption, appointed a standby counsel who participated in portions of the trial at times when defendant was excluded out of necessity, no error was made, such appointment of standby counsel being "a good common sense way" to handle such situations. Moreover, an accused who can afford to retain his own attorney is entitled to counsel of his choice though he can be made to make his choice promptly so that the trial will not be delayed; an accused who is unable to retain his own counsel has no such choice, even as to standby counsel. It is for the court who assigns counsel to determine what lawyer will be appointed. (3 Wright, Federal Practice and Procedure § 737 at 223 (1969).) It has also been held that it is not error to refuse a motion by defendant, for whom counsel had been appointed, to discharge that lawyer so that he might retain counsel of his own choice where the request came four days before the case was set for trial, and no assurance could be given that granting the request could be accomplished without delay of trial. (*McGill v. United States*, 348 F.2d 791 (D.C. Cir. 1965).) It is evident that defendant here was entirely in error in believing that *pro se* representation entitled him to special privileges at the jail, that court appointed counsel may always be of his own choice, that the court was without power to appoint standby counsel to take over the defense if it became necessary to remove him because of disruptive conduct, that he was entitled to a continuance on the day of trial to get counsel of his choice, and that counsel appointed to take over the defense need be counsel of his own choosing. He erred also in his belief that the sixth amendment rights to self-representation are immune from forfeiture.

In *Illinois v. Allen*, 397 U.S. 337, 25 L.Ed.2d 353, 90 S.Ct. 1057 (1970), it was held that a defendant may lose his sixth amendment right to be present at trial, if after being warned of the consequences of continued disruption, he nonetheless persists in conducting himself in so unruly a manner that his trial cannot otherwise orderly proceed. See also *People v. Johnson*, 24 Ill.App.3d 152, 320 N.E.2d 69 (1st Dist. 1974).

In *Mayberry v. Pennsylvania*, 400 U.S. 455, 462, 27 L.Ed.2d 532, 538, 91 S.Ct. 499, 503 (1971), Mr. Justice Douglas wrote of the conduct exhibited by defendant in that case:

> "Laymen, foolishly trying to defend themselves [of serious charges], may understandably create awkward and embarrassing scenes. Yet that is not the character of the record revealed here. We have here downright insults of a trial judge, and tactics taken from street brawls and transported to the courtroom."

Mr. Chief Justice Burger, in a special concurring opinion in *Mayberry*

(which reaffirmed *Illinois v. Allen*), stated at 400 U.S. 455, 466-68, 27 L.Ed.2d 541-42, 91 S.Ct. 499, 506:

> "Certain aspects of the problem of maintaining in courtrooms the indispensible atmosphere of quiet orderliness are crucial * * * and * * * the * * * contempt power * * * is of limited utility in dealing with an incorrigible * * * or an accused bent on frustrating the particular trial or undermining the processes of justice * * * [S]ummary removal from the court-room is the really effective remedy * * *.
>
> Here the accused was acting as his own counsel but had a court-appointed lawyer as well. This suggests the wisdom of the trial judge in having counsel remain in the case even in the limited role of a consultant. When a defendant refuses counsel, as he did here, or seeks to discharge him, a trial judge is well advised— as so many do—to have such "standby counsel" to perform * * *. No circumstance that comes to mind allows an accused to inter-fere with the absolute right of a trial judge to have such "standby counsel" to protect the rights of accused persons 'foolishly trying to defend themselves' * * *. In every trial there is more at stake than just the interests of the accused; the integrity of the process warrants a trial judge's exercising his discretion to have counsel participate in the defense even when rejected. A criminal trial is not a private matter; the public interest is so great that the presence * * * is warranted * * * to vindicate the process itself. The value of the precaution of having independent counsel, even if unwanted, is underscored by situations where the accused is removed from the courtroom under *Illinois v. Allen*. The presence of counsel familiar with the case would at the very least blunt Sixth Amendment claims, assuming they would have merit, when the accused has refused legal assistance and then brought about his own removal from the proceedings."

We think these rules controlling here, that defendant because of his persistence, after warnings, in a pattern of unruly, insolent and insulting conduct designed to frustrate the proceedings cannot validly claim that he was arbitrarily and prejudicially deprived of his right to represent himself *pro se* or was deprived of due process during the time he was *in absentia* for the *voir dire*. We find no merit in defendant's assertions to the contrary.

■■■ Defendant argues that he was denied due process because of "ineffective assistance" of counsel at the trial. It is urged that counsel was made "ineffective" because of the circuit court's order denying Mr. Vieley's motion for a 3-day continuance after his reappointment on

November 17 thereby compelling him to proceed "without adequate preparation." We find no merit in this contention. As noted earlier, Mr. Vieley had represented defendant for many months prior to trial and was relieved as counsel on October 29 upon defendant's *pro se* request. The order relieving him as counsel gave notice to Mr. Vieley that he should be standby counsel, and prepared to take over the defense at any time. Defendant agreed on October 29 to a trial date of November 16 which was fixed after many continuances. The decision as to whether to grant a continuance is a matter within the discretion of the circuit court. (*People v. Gatheright*, 9 Ill.App.3d 1058, 293 N.E.2d 734 (1st Dist. 1973).) Mr. Vieley's appointment as counsel followed defendant's insolent efforts to frustrate the legal proceedings and to force the continuance the court had denied. It is apparent from the record that Mr. Vieley very competently represented defendant and accounted to the circuit court for many hours of work on the case from the time of his original appointment as counsel on July 9 through October 29. The record shows also that in his capacity as adviser from October 30, Mr. Vieley spent many further hours on the case until the very time he was reappointed counsel on November 17. From November 16 through November 30, Mr. Vieley was engaged only in *voir dire* which was handled with considerable competence and awareness of the issues, the identities of prospective witnesses and the anticipated testimony. The record entirely fails to support the claim of error in denying a 3-day continuance. In our judgment the circuit court acted carefully and responsibly to provide defendant every constitutional right which defendant, by his conduct would permit. After warnings as to the consequences, defendant persisted in demands for a continuance in such unruly manner that it was necessary for the court to remove him, and for his own protection to reappoint Mr. Vieley. No constitutional right extends so far that courts must permit themselves to be bullied, insulted, or humiliated by defendants brought before them who are charged with crimes; flagrant disregard in the courtroom of elementary standards of proper conduct should never be tolerated. (*Illinois v. Allen.*) Defendant was made fully aware by the court of the consequences that would follow if he should continue his unruly conduct, including that Mr. Vieley would be reappointed counsel, *and the cause would proceed.* He invited that consequence.

■■ No error was made in denying without a hearing defendant's motion of November 17 for substitution of judge on account of prejudice. The same motion, alleging prejudice, was made by defendant on November 12 and was denied after opportunity for a hearing which defendant declined on the grounds that he had an absolute right. While defendant

asserts that his motion of November 17 was filed pursuant to section 114—5(c) of the Code of Criminal Procedure (Ill. Rev. Stat., ch. 38, § 114—5(c)) and was different than that filed earlier on November 12, the later motion alleges no cause except prejudice which had been alleged in the earlier motion. It is apparent from the record that by November 17, the judge had already ruled on very many substantive issues. The law set forth in *People v. Johnson*, 24 Ill.App.3d 152, 320 N.E.2d 69 (1st Dist. 1974), is controlling on this issue. It was there held that a motion for substitution of judge delayed until after the trial judge has passed on substantive issues by rulings comes too late.

██ We find no merit in defendant's contention that the circuit court proceedings are void because of a loss of jurisdiction during the interval that defendant's removal petition was pending in the Federal court. The Federal statute (28 U.S.C.A. §§ 1443, 1446(c)) contemplates a removal in certain instances of a State court criminal proceeding if the petition for removal is filed in the Federal court "at any time before trial." By its very terms Federal jurisdiction will not attach to interrupt the jurisdiction of a State court in a criminal proceeding that has already commenced. In *People v. Horelick*, 424 F.2d 697 (2d Cir. 1970), *cert. denied*, 398 U.S. 939, 26 L.Ed.2d 273, 90 S.Ct. 1839, a removal petition was filed in the United States District Court on the morning the State criminal proceeding was to commence. The district court dismissed and remanded to the State court without an evidentiary hearing. The United States Court of Appeals affirmed the district court on the grounds that the removal statute did not pertain to the case involved. At footnote 2 (424 F.2d 697, 699 N.2d), the court also stated that the obvious purpose for permitting a petition for removal to be filed at any time up to the beginning of the State criminal trial was to deal with cases where State court trials "followed swiftly after the charge, [and] not to afford a means for harrassment of State judges and prosecutors or trial delay." Other Federal cases have adjudicated that in instances where. Federal jurisdiction appears doubtful on its face, the Federal courts should act in favor of protecting State jurisdiction. While pronouncements of Federal courts as to the meaning of Federal statutes have controlling effect, nothing has been cited to this court, nor has our research uncovered any Federal case indicating that the phrase "anytime before trial," as used in 28 U.S.C.A. § 1446(c), has any different meaning than the meaning those words have been given by our State courts. In *Wilhite v. Agbayani*, 2 Ill.App.2d 29, 118 N.E.2d 440 (3d Dist. 1954), it was held that a trial "begins" when the jurors are called into the box for examination as to their qualifications, the "calling of the jury" being a part of the "trial." We conclude that the trial in this proceeding began on November 16

so that State jurisdiction was not lost during any interval that the Federal petition may have been pending on November 17. Moreover, the record shows here that the United States district judge dismissed the removal petition on the same day it was filed and made no effort to take defendant into custody of the Federal court under 28 U.S.C.A. § 1446(f).[5] So far as is ascertainable from this record, the removal petition was dismissed at the very time it was filed. There is no showing by defendant that any proceedings were had in the State court during any interval between the time the petition in the district court was filed and the time it was ordered dismissed by the district judge.

■■ Defendant complains *pro se* that one Donald Wright, an investigator for the prosecutor's office, was sworn as a bailiff. The record does show that the name, Donald Wright, appeared on the list of possible witnesses furnished by the State, that this witness was designated on the list as an employee of the prosecutor's office, and that a Donald Wright was sworn as 1 of 12 "prospective bailiffs." Even if the probablity be conceded that both references are to the same person, no objection to this procedure was made in the circuit court or raised on post trial motion and there is no showing that this "prospective" bailiff ever in fact acted in such capacity or communicated in any way with the jury. It is clear that he was never called as a witness. Since the issue was never raised in the circuit court, it cannot be raised for the first time on appeal. *Hinduliak v. Inn of the Four Lakes, Inc.,* 98 Ill.App. 2d 42, 240 N.E.2d 532 (2d Dist. 1938).

■■ Defendant asserts that the circuit court erred in permitting certain police officers to testify where the evidence shows they participated in a meeting during trial with two assistant State's Attorneys *who related to them testimony already given by others,* in violation of an order excluding witnesses. Defendant misreads the record on this point. The uncontradicted evidence is that there were no meetings during trial between any police officers and assistant state's attorneys at which testimony previously given by witnesses at the trial was related to such police officers. The circuit judge accepted that uncontradicted testimony as true and we are bound by his finding where, as here, no contrary proof appears.

■■ Defendant argues that the court erred in allowing People's Exhibits 5, 18, 19, and 24 into evidence and to be sent to the jury. The

---

[5] The language of the Federal statute appears to suggest that Federal jurisdiction in a civil cause attaches when a copy of the Federal petition and bond is filed with the clerk of the State court but that Federal jurisdiction in a criminal cause, where petitioner is in custody of a State court, attaches only upon issuance of a Federal writ of *habeas corpus.* No such writ was issued here.

record indicates (1) that following closing arguments, defense counsel concurred that each of these exhibits be sent to the jury and (2), that no objection was made during the prosecutor's closing argument concerning his description or references to these exhibits. The alleged error is therefore waived. (*Mulvey v. Illinois Bell Telephone Co.*, 5 Ill.App.3d 1057, 284 N.E.2d 356, *aff'd*, 53 Ill.2d 591, 294 N.E.2d 689 (1973).) Moreover, even though some of these photographic exhibits portrayed unpleasant and gruesome realities, we are persuaded that they had sufficient probative value to justify the circuit court's exercise of discretion in admitting them for evidence. *People v. Williams*, 60 Ill.2d 1, 322 N.E. 2d 819 (1975).

Defendant argues that he was denied a fair trial because of the prosecutor's failure to correct false testimony and because of the State's destruction of exculpatory evidence.

The claim that the prosecutor used false testimony is based on the claim that Officer Robert Conn testified falsely on cross-examination that the F.B.I. reported that it found no latent fingerprints on the alleged murder weapon and other items submitted, and that witness Jerry Lucas testified falsely on certain matters concerning payments he received from the police and whether he customarily carried a weapon. The charge that Conn testified falsely derives from the fact that the State in response to a production order indicated it had received no report from the F.B.I. in respect to latent fingerprints on the items described.

■■ The hearsay testimony of Robert Conn was not evidence used by the prosecutor but testimony solicited by defendant on cross-examination. The credibility of the testimony given by Conn and Lucas, even though contradicted by other witnesses, was a matter for the jury to determine. The assertion that the prosecutor knew the testimony of either witness to be false is mere conjecture on the part of defendant. No F.B.I. latent fingerprint examiner was called as a witness, and the source of Mr. Conn's information as to whether the F.B.I. found no latent fingerprints and reported to that effect was never a matter of inquiry. The "inference" by defendant that a latent fingerprint report was made, and identified some third person, is based wholly on conjecture.

The record fully explains how a second lineup report of identifications was substituted for the original in police files to conceal from the press the identity of Jerry Lucas as a person who participated in making identification since he was a paid police informant. The content of the original report was fully disclosed at a pretrial hearing on suppression of evidence, and the conclusion by defendant that the original report was exculpatory and its suppression prejudicial is not supported by the record.

■■■■ Defendant argues that certain discrepancies in the testimony of numerous prosecution witnesses create a reasonable and abiding doubt as to defendant's guilt. The discrepancies referred to are minor and were not in and of themselves sufficient to create reasonable doubt of guilt. (*People v. McMurray*, 6 Ill.App.3d 129, 285 N.E.2d 242 (1st Dist. 1972), *cert. denied*, 411 U.S. 918, 36 L.Ed.2d 310, 93 S.Ct. 1554.) The record here supports the conviction. There was positive identification of the defendant by several occurrence witnesses, the automobile involved was registered to defendant, the clothing he was wearing on apprehension near the scene of the wreck matched the description given by witnesses. It was for the jury to determine the credibility of defendant's alibi and the explanation of his presence at the scene. The verdict indicates that the jury did not accept the alibi evidence as true but accepted the testimony of the State's witnesses. *People v. Williams*, 60 Ill.2d 1, 322 N.E.2d 819 (1975).

During the pendency of this appeal, defendant was given leave by this court to add an additional issue that under authority of *People v. Williams* defendant is entitled to the benefit of the lesser penalties prescribed by the Unified Code of Corrections in effect on January 1, 1973, after his conviction, since his case was on appeal at that time and had not been finally adjudicated. Under the statute in effect on the date of the commission of the crime and on the date defendant was sentenced the penalty for murder was "death or imprisonment in the penitentiary for *any indeterminate term* with a minimum of not less than 14 years." (Ill. Rev. Stat. 1969, ch. 38, § 9—1.) (Emphasis added.) It is argued here, however, that on January 1, 1973, the Code, although since amended, provided that the aggregate minimum period of consecutive sentences could not exceed twice the lowest minimum term authorized for the most serious felony involved, and that this law is controlling under *Williams*. Thus it is contended that defendant's aggregate minimum sentence of 109 years (*i.e.*, 99 years for murder plus 10 for armed robbery) exceeds the 28-year (*i.e.*, twice the 14-year minimum for murder) aggregate minimum permitted by statute.

■■■■ The fallacy of defendant's argument is that it ignores a factual circumstance not presented in *People v. Williams* and a pertinent provision of the code in effect on January 1, 1973. The code in effect at that time recited at section 5—8—1(c)(1) (Ill. Rev. Stat., ch. 38, § 1005—8—1(c)(1)) that the minimum term for murder shall be 14 years "*unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term.*" (Emphasis added.) Although these 1973 provisions were not in

effect at the time the circuit court imposed its sentence, the record shows that the court in imposing a higher minimum term of 99 years for the murder did set forth its considerations as to the nature and circumstances of the offense and the history and character of defendant and its conclusions as to the necessity of a very long sentence. We conclude that the Supreme Court in *People v. Williams* did not intend that the conditions of section 5—8—1(c)(1) allowing circuit courts to impose a longer minimum term in certain circumstances should be ignored. No aggravated circumstances were considered by the circuit court, or set forth in *Williams* which would support a greater minimum term and therefore no findings were made in support of a longer term. In the case at bar, the court concluded from the evidence that a long term was necessary because, among other matters mentioned, defendant since 1958 has spent much of his time incarcerated or under court supervision because of antisocial conduct, and committed the present vicious crimes against innocent persons approximately one month after his imprisonment for a previous armed robbery notwithstanding his good education and his employment at a job befitting his high level of intelligence. We find no basis in the record for disturbing this exercise of discretion.

Lastly we find nothing improper in the prosecutor's argument that was not adequately corrected by the court's instructions. Whether the inferences the prosecutor suggested to the jury were reasonable or distorted conclusions from the evidence, as defendant claims, was solely within the province of the jury.

In the words of Mr. Chief Justice Burger in *Mayberry v. Pennsylvania*, 400 U.S. 455, 468-69, 27 L.Ed.2d 532, 541, 91 S.Ct. 499, 506, "A review of this record warrants a closing comment on the exemplary patience of the trial judge under provocation few human beings could accept with equanimity."

The judgment of the circuit court dismissing defendant's petition under section 72 is affirmed; the judgment of conviction and sentence entered by the circuit court is also affirmed.

STOUDER, P. J., and STENGEL, J., concur.