CHAOVANEE AROONSAKUL, Plaintiff-Appellant, *v.* CHARLES LARKIN
FLANAGAN, Defendant-Appellee.

First District (2nd Division)   No. 83—0553

Opinion filed May 8, 1984.

Doss, Puchalski, Keenan & Bargiel, Ltd., of Chicago (Paul J. Bargiel, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson, David J. Slawkowski, and Hugh C. Griffin, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Chaovanee Aroonsakul, appeals from a judgment entered on a jury verdict finding defendant, Charles Larkin Flanagan, not guilty of the paternity of her infant son, Ryan, born February 19, 1981. We affirm.

Plaintiff filed this paternity action on March 19, 1981. After denying defendant's motion to dismiss, the trial court, on plaintiff's petition, ordered the parties and the infant to submit to comprehensive genetic blood testing, including the statutorily authorized Human Leucocyte Antigen (HLA) blood test (Ill. Rev. Stat. 1981, ch. 40, par. 1401 *et seq.*). The tests were performed at Mt. Sinai Hospital on October 14, 1981, under the supervision and control of Dr. Chang Ling Lee, professor of pathology at Rush Medical School, board certified in clinical pathology and blood banking, and recognized expert with 14 published articles on the subject of paternity testing and HLA.

The HLA test is based on the scientific fact that every person's white blood cells contain identifiable markers or "antigens," which he inherits: one "A" group antigen and one "B" group antigen from each parent, as a pair. When both the antigens have been clearly defined, a person is considered "full house" for that antigen group, meaning that there is no possibility of any other antigen being carried. The HLA test administered in the instant case showed that the infant Ryan's two "B" antigens were B27 and B35. The test also showed that plaintiff carried B15 and B35 antigens. Therefore, because plaintiff's genetic makeup is void of a B27 antigen, her child could not have inherited one from her and must have received it from his father. The results also showed, however, that defendant carried B8 and B35 antigens, making him incapable of passing a B27 antigen to plaintiff's child and leading to the conclusion of nonpaternity.

Dr. Lee also administered a separate and independent "Km"

blood serum test which showed the infant Ryan to possess a specific protein serum marker which was found in neither plaintiff's nor defendant's blood, likewise leading to the conclusion that defendant could not have fathered plaintiff's child.

Plaintiff moved to suppress all evidence of the aforesaid tests on the grounds that during the months preceding the tests, defendant had been treated for a liver abscess for which he had received blood transfusions, and that defendant had also ingested certain medications in conjunction with this ailment and also for an arthritic condition, both of which could possibly have rendered the test results less reliable. Plaintiff also filed a motion *in limine* requesting an evidentiary hearing prior to trial for the purpose of suppressing the test results. Defendant in turn filed a motion for summary judgment, based on the validity of Dr. Lee's findings, which was supported by the affidavit of Dr. Thomas Harwood, a physician specializing in surgical pathology. Alternatively, defendant moved to dismiss plaintiff's complaint based on the test results, pursuant to the Act on Blood Tests to Determine Paternity (Ill. Rev. Stat. 1981, ch. 40, par. 1401 *et seq.*). The trial court denied all of the above motions by both parties, permitted plaintiff to take extensive discovery regarding defendant's liver ailment and medications, and ordered the case to trial. The court also denied a motion by defendant to limit the testimony at trial to only those experts who administered the court-ordered test.

Prior to trial, some nine months after defendant had ceased medication for his liver abscess, defendant submitted to a second HLA blood test, this time at Rush-Presbyterian St. Luke's Medical Center. The test was administered by Karen James, Ph.D., and director of the clinical immunology laboratory at Rush, under the supervision of Dr. Allan Luskin, associate professor of immunology and medicine and director of clinical services in immunology at Rush. The results obtained were consistent with Dr. Lee's findings excluding defendant from paternity. In addition, four of defendant's five brothers submitted to HLA blood tests which were administered by Dr. Ruta Radvany, assistant professor of surgery and director of the tissue typing laboratory at Northwestern Hospital. These tests revealed that defendant's siblings inherited the following four "B" antigens from defendant's parents, who were deceased: B8, B14, B35 and B44. Under the "full house" concept, these results indicated that neither of defendant's parents had carried a B27 antigen, making it a "genetic impossibility" for defendant to have inherited the antigen or to have passed it on to plaintiff's child.

Defendant first testified at trial pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60), now section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102). Defendant stated that he was a 55-year-old physician, specializing in internal medicine and on the staff of Northwestern Hospital. He and plaintiff lived in the same building on North Lake Shore Drive in Chicago. He first met plaintiff socially at a New Year's Eve party in the building on January 1, 1980, although he had known her professionally prior to that time. He first had intercourse with plaintiff in late February of that year. Between February and July of 1980, the parties had intercourse between six and 12 times. Defendant stated that he experienced some ejaculatory difficulty during that time and did not believe that he was able to achieve orgasm. Nevertheless, in response to a question about birth control, defendant stated that he had practiced withdrawal during sex with plaintiff. He believed he became aware of plaintiff's pregnancy in late June of 1980, and had sex with her one time after that. He did not send plaintiff to a gynecologist, nor did he accompany her to any abortion clinic. In late May or early June 1981, defendant underwent treatment for a liver abscess, for which he ingested the medication Flagyl for 10 days as well as Chloroquin for a period of weeks up until September of 1981. He had also taken a thyroid hormone called Synthroid for a number of years, and may have had some "growing old" arthritis called osteoarthritis. After plaintiff's baby was born, she phoned him several times, asking him to come see the child. He visited her once briefly in the hospital, while making his rounds. It was stipulated that defendant refused to sign the child's birth certificate, and he at no time agreed to the child's being called Flanagan.

Plaintiff then testified that she was a 37-year-old physician with her own private practice, and was house doctor for the building in which she and defendant lived. She was single and had never been married. On January 13, 1980, she told defendant that she would consider having sex with a Caucasian man, but not with him. Nevertheless, in February she began having intercourse with defendant approximately two to three times a week, and later approximately once a week, up until August of 1980. Plaintiff stated that after she started dating defendant she did not have intercourse with anyone else until after her baby was born on February 19, 1981. She was aware that defendant had an orgasm inside her during this time; however, she did not believe that she was able to conceive, and had expressed this opinion to her friends. She stated that defendant

drove her to an abortion clinic and became angry when she said she did not want to have an abortion.

Plaintiff called no medical witnesses during her case in chief. Defendant called five experts: Drs. Lee, James, Luskin, Radvany and Harwood, each of whom testified as to the validity of the various blood tests administered to the parties, the child, and defendant's brothers, which conclusively excluded defendant as the father of plaintiff's child. It was also agreed that while it might be theoretically possible that under some speculative circumstances a medication could "mask" an antigen, *i.e.*, prevent it from being identified, medication could not change one identifiable antigen into another identifiable antigen. In the instant case, both of defendant's "B" antigens were identifiable as B8 and B35; thus, under the previously discussed "full house" concept, defendant was genetically incapable of passing a B27 antigen to any child of his.

In rebuttal, plaintiff presented three witnesses who questioned the reliability of HLA test results where medication of the type that defendant had ingested was introduced within six months of the test; however, they were unable to cite any case, report, or study in which an inherited and identifiable HLA antigen was ever found to have been changed into another identifiable antigen by any such medication. None of plaintiff's witnesses administered any tests of their own, nor did they claim expertise in the field of paternity testing. Finally, on questioning from the trial court, one of plaintiff's witnesses admitted his belief that the degree of probability that defendant was the father of plaintiff's child was "low."

The trial court denied defendant's motions for a directed verdict both at the close of plaintiff's case and at the conclusion of all the evidence, and also refused all instructions which would have made the results of the blood tests conclusive on the jury. The case was then submitted to the jury, which returned a verdict finding defendant not guilty of paternity. Plaintiff filed a post-trial motion seeking in the alternative a judgment *n.o.v.*, an arrest of judgment and the granting of a new trial or of an evidentiary hearing on her previously filed motion *in limine*. The motion was denied.

Plaintiff first argues that her motion for a new trial should have been granted because the jury relied exclusively on the results of the HLA and Km series blood tests administered by Dr. Lee, which results were tainted by defendant's use of medication for a liver ailment and were therefore improperly introduced into evidence. Plaintiff cites section 4 of the Act on Blood Tests to Determine Paternity (Ill. Rev. Stat. 1981, ch. 40, par. 1404), which provides in part:

"Sec. 4. (a) If the court finds, as disclosed by the evidence based upon the tests, that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings, such findings shall not be admissible, and the question of paternity shall be submitted upon all the evidence."

She then argues that if blood tests are inadmissible in paternity actions where the experts disagree in their findings, they should also be inadmissible where, as here, the experts testify that the raw data obtained from the test is questionable because of continued drug use and illness which has an effect on the cellular structure of the blood. Plaintiff's arguments lack any basis in law or fäct, however.

■ Initially, plaintiff's reliance on section 1 of the Act on Blood Tests to Determine Paternity (Ill. Rev. Stat. 1981, ch. 40, par. 1401) dealing with the effect of blood tests is misplaced, as that section clearly relates to a situation involving a disagreement by court-appointed experts as to their test findings. The section provides:

"Sec. 1. In a civil action in which paternity is a relevant fact, the court, upon its own initiative or upon motion of any party to the action, may order the mother, child and alleged father to submit to blood tests, including Human Leucocyte Antigen tests, to determine whether or not the man may be included or excluded as being the father of the child. The results of the tests shall be receivable in evidence in accordance with Section 4 of this Act. If the defendant refuses to submit to such tests, such fact shall not be disclosed upon the trial." (Ill. Rev. Stat. 1981, ch. 40, par. 1401.)

Section 2 of that act further provides:

"Sec. 2. The tests shall be made by experts, not to exceed three, duly qualified as examiners of blood types who shall be appointed by the court. The experts may be called by the court as witnesses to testify to their findings and shall be subject to cross-examination by the parties." Ill. Rev. Stat. 1981, ch. 40, par. 1402.

■ In the instant case, none of plaintiff's witnesses performed any HLA test or made any test findings of their own; rather, they offered nothing more than vague and highly speculative opinions questioning the reliability of Dr. Lee's findings based upon the medications which defendant had taken for his liver ailment during the months prior to the test. Conversely, defendant's experts expressly disavowed that defendant's condition or the medication that he in-

gested could in any way affect the reliability of Dr. Lee's findings. The case of *Daubach v. Ishihara* (1981), 103 Ill. App. 3d 750, 431 N.E.2d 1183, which is cited by plaintiff, actually lends support to defendant's position with regard to the propriety of admitting the results of the court-appointed test. In *Daubach*, this division considered the results of two blood tests which were issued to determine paternity, one of which excluded paternity and the other of which was "inconclusive" due to its failure to exclude various genetic characteristics of the Japanese race, of which defendant was a member. The court held there that where the test results themselves did not appear to be in disagreement, they were properly admitted into evidence, even though the applicable statute stated that the tests shall be receivable in evidence only if a "definite exclusion" is established. (103 Ill. App. 3d 750, 753-54, citing Ill. Rev. Stat. 1977, ch. 40, par. 1401.) The results of the blood tests were properly admitted into evidence.

Once determined that the test results were properly admitted, the reliability of those results in light of plaintiff's rebuttal testimony was properly before the jury. (See, *e.g., Walczak v. General Motors Corp.* (1976), 34 Ill. App. 3d 773, 340 N.E.2d 684, citing the general rule that the weight to be assigned to an expert opinion is for the jury to determine in light of his credentials and the factual basis for his opinion.) In the instant case, the jury's determination is amply supported by the record.

■ Nor is there any validity to plaintiff's contention that the court-ordered test results were the "sole basis" for the jury's verdict. Rather, the record contains overwhelming support for the jury's verdict, wholly separate and apart from Dr. Lee's HLA findings, including: a second HLA test administered nine months after defendant ceased taking medication for his liver; a separate, Km serum blood test which likewise established nonpaternity; HLA tests performed on defendant's siblings leading to the same conclusions, as well as the testimony of the parties themselves. *People ex rel. Martin v. Presswood* (1980), 85 Ill. App. 3d 975, 976-77, 407 N.E.2d 770, and citations therein (in a paternity suit, both the mother and the defendant are competent witnesses, and their credibility is determined by the trier of fact).

■ Plaintiff next claims reversible error in the trial court's handling of the cross-examination of Dr. Lee, defendant's chief expert witness. As defendant points out, none of the specific points raised in plaintiff's brief were set forth in her post-trial motion, which contains only a general objection to the admission of "all of defendant's

exhibits" and to "improper defense testimony." The alleged errors can, therefore, be considered waived. *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 348-53, 415 N.E.2d 337.

Plaintiff's argument also fails on the merits. Plaintiff's attempt to characterize Dr. Lee as a "court's witness" whose testimony was improperly elevated in the minds of the jury is not founded in the record. Rather, Dr. Lee was called by defendant, and was subject to extensive cross-examination by plaintiff's counsel. Moreover, the jury was properly instructed as to the weight to be given experts' opinions.

As set forth in *Daubach* and other authorities cited in plaintiff's brief, "exclusionary [blood test] report in itself should not be used to deprive plaintiff of a trial to present its own testimony and to attack the credibility of the test." (*Daubach v. Ishihara* (1981), 103 Ill. App. 3d 750, 755; *People ex rel. De Vos v. Laurin* (1979), 73 Ill. App. 3d 219, 391 N.E.2d 164.) There can be no question but that the trial court followed this rule in the instant case, as evidenced by its denial of all of defendant's motions for dismissal and summary judgment and directed verdict, its refusal of all jury instructions which would give the blood test results conclusive effect, and its leniency in allowing plaintiff to call rebuttal witnesses, over defendant's objections.

▆ Finally, plaintiff argues that the trial court erred in denying her motion notwithstanding the verdict. Such judgments are to be entered only when "*** all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) For the reasons previously stated, we find plaintiff's argument to be without merit.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and DOWNING, J., concur.