THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELLIS PARTEE, Defendant-Appellant.

First District (2nd Division) No. 84—2067

Opinion filed May 26, 1987.—Modified on denial of rehearing July 21, 1987.

236

238

Steven Clark and Richard F. Faust, both State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Sally J. Bray, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant was convicted of attempted armed robbery and three counts of aggravated battery after a jury trial in which defendant appeared *pro se*. He was sentenced to extended terms of 30 years for attempted armed robbery and 10 years for each count of aggravated battery to run consecutively. Defendant now raises numerous issues on appeal.

Defendant was arrested on February 20, 1983, and charged with attempted murder, attempted armed robbery, and three counts of aggravated battery. On July 12, 1983, defendant and his counsel appeared before Judge Frank Orlando. Defendant's counsel requested to withdraw as counsel and defendant requested an automatic substitution of judge. Both motions were granted and the cause was assigned to Judge Lester Bonaguro. Defendant was thereafter represented by a public defender and was assigned to Judge Rosaland M. Crandell on October 7, 1983, due to Judge Bonaguro's ensuing transfer. On Octo-

ber 18, 1983, Judge Francis Glowacki heard a second motion by defendant for substitution of judge for cause alleging prejudice to defendant by Judge Crandell. The motion was stricken by the court, which found that it inadequately set forth a basis for substitution of judge. On October 18, 1983, defendant again appeared before Judge Crandell to request an extension of time to retain private counsel to represent him. The court granted defendant a one-week extension. On October 25, 1983, defendant appeared again before Judge Crandell and asked to act as his own attorney. Judge Crandell granted defendant's request but asked the two public defenders present to remain in an advisory capacity. On November 1, 1983, defendant requested the court to appoint Public Defender Allan Sincox to act as his attorney. Judge Crandell granted the request and set November 16 for the hearing on motions.

On November 28, 1983, defense counsel presented a motion for substitution of judge as a matter of right, rather than for cause as argued previously. Defense counsel argued that defendant was entitled to two substitutions of judge under section 114—5 of the Illinois Code of Criminal Procedure of 1963 because he was charged with a Class X felony. Counsel maintained that such substitution of judge need not be filed at the same time. The State asserted in reply that defendant's case had been on the call of three prior judges and that defendant had failed to file a motion for substitution of judge within the required 10 days. At the close of all arguments, Judge Crandell held that in an effort to avoid any problems which might void all subsequent proceedings, and with the understanding that this would be the final substitution allowed, it would assign the defendant's case, based upon the presiding judge's authority, to Judge Cohen. However, on December 8, 1983, upon the State's motion for reconsideration, Judge Crandell reversed her previous decision to reassign the case. Judge Crandell subsequently presided at defendant's trial.

On April 23, 1984, defendant appeared before the court and asked that public defenders, Allan Sincox and Dale Coventry, be placed in an advisory role and that he be allowed to represent himself. Defendant was advised of his rights under Supreme Court Rule 401 (107 Ill. 2d R. 401) concerning the waiver of counsel and was directed to execute a written waiver. Moments later, defendant moved to act as co-counsel to the public defenders, who would continue to represent him. On April 30, the court reviewed defendant's *pro se* request and appointed Public Defender Gino Peronti to act as standby counsel.

On May 2, 1984, defendant again moved to substitute Judge Crandell for cause. Judge Crandell reassigned the cause to Judge Kavitt,

who presided at a hearing on defendant's motion. During this hearing, defendant also advised the court that he wished to be represented by Public Defenders Sincox and Coventry. Counsel argued defendant's motion for substitution of judge, citing various incidents which defendant maintained prejudiced Judge Crandell against his case. Judge Kavitt denied defendant's demand that Judge Crandell testify or submit an affidavit to explain her acts, finding that the applicable statute required neither. Judge Kavitt then denied defendant's motion, finding that defendant made no showing that Judge Crandell was prejudiced and could not give defendant a fair trial. After this hearing, defendant returned to Judge Crandell's courtroom and advised the judge that he wished to return to *pro se* status.

Thereafter, at defendant's request, the court granted him permission to make daily telephone calls and to visit with material witnesses and allowed defendant to have access to the law library. On May 11, 1984, the trial court denied defendant's request to appoint Randolph Jonakait, an attorney and author of a law review article on serology, as an expert for the defense. Emmett Harmon, a biochemist and serologist, was subsequently appointed by the court. The court also denied the appointment of Kathy Bennett, a jury expert, to assist defendant during *voir dire* and denied the appointment of a private investigator to assist defendant. The court recommended the appointment of a staff psychiatrist to assist defendant in his alleged insanity defense, but defendant rejected this offer.

On May 11, 1984, after defendant reaffirmed his wish to represent himself, the trial court denied his request to appoint Coventry and Sincox as standby counsel. The court then made certain findings as to defendant. It found that defendant was under no mental disability and that he knowingly and intelligently elected to proceed in his own defense. The court also found that defendant understood the nature of the charges and the seriousness of the possible penalties for those charges.

On May 14, 1984, the court received a letter from the director of the Cook County jail, explaining that defendant's requests for unlimited telephone calls and visits from material witnesses could not be complied with, explaining that such allowances had never been made for other inmates and would cause great disruption.

When *voir dire* began on May 30, 1984, defendant appeared in court without shoes, claiming that he was rushed by jail officers to get ready. The court requested a deputy sheriff to get shoes for defendant. Thereafter defendant again asked the court to appoint standby counsel. The court denied defendant's request, commenting that it would

either allow defendant to appear *pro se* or to be represented by a public defender, but would not allow a "hybrid," as such method was unsuccessful in the past. The court also remarked that it had repeatedly explained this matter to defendant and defendant had elected to proceed *pro se.*

Under *voir dire,* two prospective jurors indicated that they had reservations about the fact that defendant had access to personal information regarding themselves and their family, particularly their addresses, through their jury cards. When questioned by the court whether their concerns would affect their ability to be fair and impartial, both responded that it would not. Over defendant's objection, their addresses were deleted from their jury cards.

Before the entire jury had been selected, defendant exhausted the 10 peremptory challenges allotted to him. Defendant requested five additional challenges but was denied such request. Defendant later complained that eight of the veniremen who had been excused, apparently by the State, were black. Defendant also objected to the excusing of one veniremen, apparently also black, at the juror's request that he had to attend to a sick relative and could not give his full attention to the trial.

Defendant's trial commenced on June 1, 1984. Defendant appeared in a jogging suit and claimed that he was compelled to do so by a prison official who refused to allow him to bring a change of clothing. Defendant maintained that it was his practice to wear a jogging suit to the court building and to then change into civilian clothes. The court noted that defendant had not had this problem on his 60 prior court visits and admonished him to thereafter dress appropriately.

The victim, Gladys Peterson, testified that on February 20, 1983, at approximately 12:15 p.m., she arrived at Woodfield Shopping Center in Schaumburg, Illinois, to pick up her mother. As she searched for a parking space, she observed a man, identified as defendant, standing near a parked car. She parked nearby and began to exit her car when she looked up to see defendant standing outside the car, preventing her from opening or closing the door. Defendant told her, "Stay in the car. This is a robbery." Peterson pushed defendant and knocked off his sunglasses, then began to scuffle with him. She sounded her horn and the struggle continued. Defendant ordered the victim to lie down and punched her in the throat. Peterson told defendant that she had no money, to which defendant responded, "All right, I am going."

When defendant left, the victim again sounded her horn. She saw a man standing nearby, identified later as Edwin Florian, and asked him for help. She then realized that she was covered with blood. Peter-

son was transported by paramedics to the hospital. Peterson suffered permanent scarring along her jawline and lower neck. She stated that she did not have an opportunity to view defendant, but was able to recall his voice. She stated that she recognized his voice again when defendant called her at home shortly after the pretrial hearing and identified himself as her assailant. Defendant reportedly apologized for injuring her and explained that "some things were happening in his life at the time." Peterson found a turn signal indicator stuffed down in the driver's seat approximately 10 days after the incident.

On cross-examination, Peterson stated that she did not see any weapon and that defendant never told her that he intended to kill her during the incident.

Edwin Florian testified that he was returning to his car at Woodfield Mall with his wife on the afternoon of February 20, when he was alerted by screams from Peterson's car, parked next to his own. Florian saw a man beating a woman. When Florian approached within five feet of the car, the man, identified as defendant, looked up and saw Florian and fled through the lot. Florian saw defendant enter his car, a tan-colored Toyota, and got the license plate number as he drove away. Florian returned to assist the victim and saw that her face was bloodied. Moments later, Florian saw defendant return to the scene in his car. Florian again viewed defendant from a distance of 8 to 10 feet. When the police arrived, he gave them a description of defendant and defendant's car. That evening Florian identified defendant in a police lineup.

Barrington police officer Mark Kaspar testified that he received a radio call of an attempted armed robbery at Woodfield Mall. The suspect was identified as a black male in his twenties, wearing a tan sweater and sunglasses, driving a tan Datsun with license plate number YQA 84. Officer Kaspar sighted defendant's car approximately one-half hour later and pursued and apprehended defendant. No weapon was found on defendant during a routine search. Officer Kaspar could not remember whether defendant had any scratches on his face at the time of his arrest.

Schaumburg police officer Joseph Henry testified that on February 20, 1983, he was sent to Barrington to retrieve defendant from Officer Kaspar's car and to transport defendant back to Schaumburg. A substance that appeared to be blood was on defendant's pants, shirt, and shoes. Defendant's face was covered with scratches. Henry stated on cross-examination that he found no weapons in defendant's possession.

Michael Smith, a Schaumburg police department evidence technician, testified that he inventoried Peterson's car on the afternoon of

February 20, 1983. Officer Smith observed an excessive amount of blood on the front seat of Peterson's car and on a pair of sunglasses found therein. Officer Smith also identified several photographs taken of defendant upon his arrest, which showed that five to seven large scratches were present on defendant's face. Officer Smith further identified several articles of clothing worn by defendant at the time of his arrest which were covered with blood.

Schaumburg police sergeant Thomas Ostermann testified that he was present at the police lineup on February 20. Ostermann stated that defendant refused to cooperate and placed his head down on the table in front of him. The six other participants in the lineup were instructed to do likewise to maintain uniformity and to avoid calling undue attention to defendant. Defendant's head was raised with assistance from a police officer and he was identified by Edwin Florian.

Dr. James Pawlikowski, a specialist in peripheral vascular surgery, testified that he examined the victim when she was brought into the emergency room on February 20. She suffered lacerations to her head and neck, up to two inches in length. He also observed a puncture wound at the base of Peterson's left ear, 1½ inches in depth, and a laceration inside the ear canal. Dr. Pawlikowski stated that the lacerations looked like surgical incisions and would have been caused by a sharp object. He opined that a fingernail or an instrument such as the broken turn signal indicator could not have caused any of the victim's injuries, with the exception of her canal wound.

Dr. Mohammad Tahir, an expert in forensic serology with the Illinois Department of Law Enforcement, testified that he prepared an electrophoretic analysis of defendant's blood for genetic markers. Dr. Tahir explained that these markers are different with each person and can be detected in either liquid or dried blood. Dr. Tahir examined a sample of defendant's blood, as well as samples taken from defendant's bloodstained clothing, and found that the bloodstains could not have originated from defendant. Dr. Tahir further opined that such bloodstains could have originated with the victim. Dr. Tahir's findings were corroborated by Joseph Day, also a forensic serologist. Day examined the bloodstains found on defendant's clothing as well as samples of Peterson's blood approximately six weeks after the incident. Day similarly concluded that these bloodstains could not have originated from the defendant. Day acknowledged that one fact affecting analysis of bloodstains was the type of fabric into which the stain was absorbed.

On June 6, 1984, midway through trial, defendant requested that the trial court enforce the service of three subpoenas defendant alleg-

edly submitted to the court clerk. The court found that the persons to be served were outside Cook County and hence not within the sheriff's jurisdiction of service and denied defendant's motion. The court also noted that defendant had established no connection between the persons to be served and the instant case.

Defendant presented two witnesses on his behalf. Emmett Harmon, an analytical chemist trained in serology, testified that he had not tested any of the blood samples in the present case. Harmon stated that genetic marker tests performed on bloodstains stored under usual conditions for two months would produce doubtful results. He was asked whether the preservation of a bloodstain was affected by the type of fabric in which it was absorbed. Harmon's affirmative answer was objected to by the prosecutor and such objection was sustained.

Dr. James Hicks, a pathologist, stated that he examined medical reports of treatment administered to Peterson and also examined the victim in January 1984. Dr. Hicks opined that the victim's injuries were superficial, although he admitted that they required surgery and resulted in scarring. Dr. Hicks found that defendant probably did not have a knife in his hand at the time of the incident because Peterson's wound would have thus been deeper and more severe. Hicks was asked whether he thought the victim had been slashed with a cutting instrument, but the prosecutor's objection to this was sustained. He opined that the victim's injuries could have been caused by something other than a dangerous weapon.

Following closing arguments, a conference on jury instructions was held. The trial court refused defendant's tendered instructions on aggravated assault, finding that defendant was not charged with such crime nor was this crime a lesser-included offense of any crime with which defendant had been charged. The court also refused defendant's tendered instruction on battery, finding that the State's battery instruction was more appropriate as defendant's instruction involved language to be given in a case in which an affirmative defense is alleged. The court further refused defendant's instructions on robbery and theft. The jury was instructed and after deliberation, acquitted defendant of attempted murder but found defendant guilty of attempted armed robbery and three counts of aggravated battery.

The public defender's office was appointed to represent defendant at the sentencing hearing. The court was presented with certified copies of defendant's two 1973 convictions for armed robbery and 1983 conviction also for armed robbery. Defendant committed the instant crime while on bond from the 1983 conviction. The court also considered the circumstances surrounding the instant case, including the fact

that Peterson's face and neck had been slashed, resulting in permanent scars. In mitigation, the court refused to admit into evidence the trial transcript of defendant's 1983 conviction of armed robbery, by which defendant apparently sought to establish that he suffered from some type of mental disorder. At the close of the hearing, the court sentenced defendant to extended consecutive terms of 10 years for each count of aggravated battery and an extended term of 30 years for attempted armed robbery.

Defendant's first contention is that the trial court erred in denying defendant's motion for automatic substitution of the trial judge. There are two methods in which a defendant can move to substitute a trial judge. A defendant may seek "automatic substitution" of the judge (Ill. Rev. Stat. 1983, ch. 38, par. 114—5(a)) or removal of the judge "for cause" (Ill. Rev. Stat. 1983, ch. 38, par. 115—5(c)). Section 114—5(a) provides for automatic substitution as follows:

> *"Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge* the defendant may move \*\*\* for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this subsection; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." (Emphasis added.)

Section 114—5(c) allows for substitution for cause and provides:

> "In addition to the provisions of subsections (a) and (b) of this Section any defendant may move *at any time* for substitution of judge for cause, supported by affidavit. Upon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion; provided, however, that the judge named in motion need not testify, but may submit an affidavit if the judge wishes. If the motion is allowed, the case shall be assigned to a judge not named in the motion. If the motion is denied the case shall be assigned back to the judge named in the motion." (Emphasis added.)

On July 12, 1983, defendant filed a motion before Judge Frank Orlando seeking an automatic substitution of Judge Orlando pursuant to section 114—5(a). The trial court granted defendant's motion and the cause was assigned to Judge Lester Bonaguro. Judge Bonaguro was subsequently transferred and the cause was assigned to Judge Rosa-

land M. Crandell on October 7, 1983. On that same day, defendant appeared before Judge Crandell and filed a motion for substitution of Judge Crandell for cause. Pursuant to section 114—5(c), the cause was transferred to Judge Francis Glowacki for a hearing to determine if there was evidence that Judge Crandell was prejudiced against defendant. On October 18, Judge Glowacki ruled that defendant's motion be stricken for failure to state a factual basis for substitution of Judge Crandell on grounds of prejudice. The cause was then reassigned to Judge Crandell for trial.

On November 28, 1983, defense counsel argued that defendant should have been granted a substitution of judges as a matter of right and for cause. On November 29, the trial court granted defendant's motion on the basis that section 114—5(a) allows those accused with Class X felonies two automatic substitutions of judges. On December 8, the trial court, with Judge Crandell presiding, granted the State's motion to reconsider and reversed her ruling transferring the case for reassignment.

▪ Defendant asserts that section 114—5(a) allows those accused with Class X felonies the right to name two judges in two separate motions for substitution within 10 days of the assignment of the cause to their respective trial calls. We disagree. Prior to 1979, section 114—5(a) provided that *all* defendants had the right to automatically substitute two judges. (Ill. Rev. Stat. 1977, ch. 38, par. 114—5(a).) The committee comments provided that "[t]his section allows one motion but the motion may contain the names of two judges." (Ill. Ann. Stat., ch. 38, par. 114—5, Committee Comments, at 253 (Smith-Hurd 1977).) Therefore, this court determined that section 114—5(a) provided a defendant with one opportunity to substitute two judges. *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 693, 402 N.E.2d 915; *People v. Davis* (1977), 54 Ill. App. 3d 517, 524, 369 N.E.2d 1376; *In re Stiff* (1975), 32 Ill. App. 3d 971, 974, 336 N.E.2d 619.

In 1979, section 114—5(a) was amended to provide that only defendants charged with Class X felonies are allowed two automatic substitutions, with all others allowed only one substitution as a matter of right. We believe that, in the absence of language to the contrary, the legislature intended no change in the procedure by which a defendant seeks an automatic substitution of judges. Therefore, we hold that section 114—5(a) provides a defendant charged with a Class X felony with only one opportunity to substitute two judges within 10 days after his cause is placed before the trial call of a judge.

In the instant case, defendant's first motion to substitute judges was filed within 10 days of the cause' being placed on Judge Orlando's

call. The July 12, 1983, motion, however, failed to request substitution of Judge Crandell. Therefore, the trial court was correct in denying defendant's second motion to substitute Judge Crandell where defendant failed to include Judge Crandell in defendant's first motion.

■ Defendant's second contention is that the trial court committed reversible error by reconsidering its decision to grant defendant's motion to substitute Judge Crandell from the case. We find that Judge Crandell's reconsideration of the court's ruling was proper where defendant's motion for substitution for cause was properly reassigned to her after Judge Glowacki determined that defendant's allegation of prejudice lacked a factual basis. Section 114—5(c) specifically provides that if a motion for cause is denied "the case shall be assigned back to the judge named in the motion." The trial court correctly recognized that it had improperly granted defendant's "motion" for automatic substitution and therefore vacated the judgment. It is well established that a motion to reconsider is an appropriate method to be utilized by the trial court to correct its own error. (*People v. Stokes* (1977), 49 Ill. App. 3d 296, 298, 364 N.E.2d 300.) Therefore, it is clear that the trial court had jurisdiction to rule on the State's motion to reconsider.

■■ ■ Defendant's third contention is that he was denied an opportunity to effectively represent himself where the trial court abused its discretion by not allowing defendant standby counsel during trial. An accused has a sixth amendment right to be represented by counsel or to waive counsel and proceed *pro se*. (*People v. Campbell* (1984), 129 Ill. App. 3d 819, 820, 473 N.E.2d 129.) Yet, the accused has no such right to both representation to counsel and to also conduct portions of the proceeding on his own. (*McKaskle v. Wiggins* (1984), 465 U.S. 168, 178-84, 79 L. Ed. 2d 122, 133-37, 104 S. Ct. 944, 950-54.) A court also may appoint "standby counsel" to assist a *pro se* defendant and to protect the judicial process from deterioration occasioned by improper and inadequate conduct of the defense. (See *Faretta v. California* (1975), 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581-82, 95 S. Ct. 2525, 2541; see *People v. Allen* (1967), 37 Ill. 2d 167, 172, 226 N.E.2d 1.) The court "possesses broad discretion in relation to the appointment of counsel for advisory or other limited purposes to supersede the defendant in the conduct of the defense." (*People v. Allen* (1967), 37 Ill. 2d 167, 172, 226 N.E.2d 1; see *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 79 L. Ed. 2d 122, 132-33, 104 S. Ct. 944, 950.) We hold that the trial court did not abuse its discretion by denying defendant standby counsel.

The trial court properly denied defendant's request for standby counsel where the court believed that if it allowed such counsel defendant would attempt to act *pro se* on some matters and then seek repre-

sentation with counsel on other matters. In *McKaskle v. Wiggins*, the Supreme Court cautioned that multiple voices "for the defense" will confuse the message the defendant wishes to convey, thus defeating the purpose of the defendant appearing *pro se* as announced in *Faretta*. The court further stated that:

> "First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over defendant's *** objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." (Emphasis in original.) *McKaskle v. Wiggins* (1984), 465 U.S. 168, 178, 79 L. Ed. 2d 122, 133, 104 S. Ct. 944, 951.

█ On April 30, 1984, the trial court allowed defendant's *pro se* request and appointed public defender Gino Peronti as standby counsel. During a hearing before the court on May 11, 1984, defendant informed the court that he was not capable of presenting the motion being argued; therefore, he requested and the court granted defendant's motion for Gino Peronti to be appointed to represent defendant. The court made clear to defendant, however, that defendant's appointment of counsel would be for the entire trial; that defendant had persisted in delaying the trial; that the court would not allow a "hybrid" proceeding in which defendant could have counsel representing him on some matters but not on others. On May 18, 1984, defendant, in direct contradiction of the court's previous order, again requested that he be allowed to represent himself *pro se*. At that point, the court granted defendant's request to appear *pro se* without the appointment of standby counsel. Defendant did not object to the court's decision not to appoint standby counsel. On May 30, 1984, however, defendant requested that standby counsel be appointed. The court denied his request. The court offered defendant the alternative of having the public defender's office represent him or allowing defendant to appear *pro se*. After making an intelligent and knowing waiver, defendant agreed to represent himself *pro se*.

█ The trial court's refusal to allow a hybrid trial was clearly not an abuse of its discretion. Defendant caused his own problems by his ambivalence as to whether he wished to represent himself. Initially, he requested counsel until it was given. He then repeatedly withdrew his requests for counsel and asked to represent himself. That being allowed, he again reverted to a motion for appointment of counsel, and being given that, asked for the opposite. While a defendant should be

afforded every opportunity to secure counsel of his own choosing, a defendant cannot impose unnecessary delays on the court for the purpose of disrupting or undercutting the orderly administration of justice. See *People v. Heidelberg* (1975), 33 Ill. App. 3d 574, 591-94, 338 N.E.2d 56; *United States v. Burton* (D.C. Cir. 1978), 584 F.2d 485, 489.

■ Defendant's fourth contention is that he was denied an opportunity to effectively represent himself because he had no access to a law library or legal materials. We hold that defendant's contention is without merit. In *People v. Heidelberg* (1975), 33 Ill. App. 3d 574, 591, 338 N.E.2d 56, this court rejected defendant's contention that an incarcerated *pro se* defendant must be afforded access to a law library. In reaching this conclusion, the court stated:

> "Where a prisoner in custody knowingly and voluntarily elects to manage his defense, he relinquishes many of the traditional benefits associated with the right to counsel. The constitution does not require in the case of a prisoner who elects to represent himself *pro se*, that he be exempted from regular jail procedures and searches, and *no duty exists where such facilities are not commonly available in a common jail, to provide him law books, or private telephones, or unlimited access to witnesses, investigators or other items he may feel necessary. By electing to represent himself, a prisoner in custody may not expect favored and privileged treatment even though the result may be that he is less effective as his own attorney.*" (Emphasis added.) *People v. Heidelberg* (1975), 33 Ill. App. 3d 574, 591, 338 N.E.2d 56.

In *People v. George* (1980), 85 Ill. App. 3d 443, 445, 406 N.E.2d 936, this court questioned whether *People v. Heidelberg* was valid authority given the Supreme Court's decision in *Bounds v. Smith* (1977), 430 U.S. 817, 52 L. Ed. 2d 72, 97 S. Ct. 1491, which established that convicted prisoners confined to a penitentiary must be allowed the use of a law library or adequate assistance from persons trained in the law. This court held that at most *Bounds* can be read to require authorities to provide prisoners with "adequate law libraries or *adequate assistance from persons trained in the law.*" (Emphasis in original.)

In the instant case, defendant was given sufficient access to an adequate law library and adequate assistance from persons trained in the law. On May 2, 1984, Judge Crandell entered an order permitting defendant access to the law library of the State's Attorney's office on dates that he was brought before the court. The prosecutor stated that he had no objection to defendant's request. He further stated that he would assist defendant when he makes a request for a specific book

but that his office would not allow defendant to roam around the State's Attorney's office. On May 4, defendant complained that he was being denied access to the State's Attorney's library. The prosecutor stated that he had personally asked defendant what books he requested but that defendant did not have any requests. On May 11 the prosecutor testified that he had received a request for materials from defendant and had supplied him with all the materials which were available from the State's Attorney's library. The prosecutor claimed that the order allowing defendant access to the State's Attorney's library should be rescinded because defendant was abusing it and using it as an excuse for either a continuance or for some other purpose. The trial court rescinded the order allowing defendant access to law library materials in the State's Attorney's office. On May 24, defendant moved the court to order that the prison authorities allow defendant access to the law library at the Cook County jail on a daily basis, morning and afternoon sessions, during the pendency of the cause. Defendant informed the court that he was only being allowed to use the prison library on Sundays. The trial court granted defendant's motion but added to the motion that such access shall not delay trial of the case set to begin on May 29, 1984.

A review of the record reveals that defendant had access to law libraries and adequate assistance from counsel. Prison authorities informed the court by letter of the procedures that an inmate must go through to gain access to the law library at the Cook County jail. The letter stated that all prisoners are allowed access during morning and afternoon sessions; that no inmate is ever refused use of the law library. Thus, unlike *Heidelberg*, defendant had access to a prison library. Finally, we note that defendant had assistance from individuals trained in the law where he was represented by counsel or allowed standby counsel up until May 18, 1984, when he requested to proceed *pro se*.

■■■ Defendant's fifth contention is that he was denied an opportunity to effectively represent himself where prison officials refused to honor court orders requiring visits by potential witnesses, telephone calls, outside correspondence, and hot meals after court appearances. When an accused knowingly and voluntarily elects to manage his own defense, he relinquishes many of the traditional benefits associated with the right to counsel. (*Faretta v. California* (1975), 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581-82, 95 S. Ct. 2525, 2541.) As stated in *Heidelberg*, a *pro se* defendant is not entitled to special privileges such as a private telephone, unlimited access to witnesses, or other items he may feel are necessary. A *pro se* defendant may not expect favored

treatment even though the result may be that he is less effective as his own attorney. *People v. Tuczynski* (1978), 62 Ill. App. 3d 644, 650, 378 N.E.2d 1200; *People v. Heidelberg* (1975), 33 Ill. App. 3d 574, 338 N.E.2d 56.

■■■ The Supreme Court has declared that "the effective management of the detention facility once (an) individual is confined *** may justify imposition of conditions and restrictions (on) pretrial detention ***." (*Bell v. Wolfish* (1979), 441 U.S. 520, 540, 60 L. Ed. 2d 447, 469, 99 S. Ct. 1861, 1874-75.) Furthermore, the court has recognized that prison officials have broad administrative and discretionary authority over the institutions they manage because prison management is at best an extraordinary undertaking. (*Hewitt v. Helms* (1983), 459 U.S. 460, 467, 74 L. Ed. 2d 675, 685, 103 S. Ct. 864, 869.) In light of these restrictions, defendant was nonetheless afforded access to telephones, visits by witnesses, and allowed unlimited correspondence.

■■■ On May 2, 1984, Judge Crandell entered orders permitting defendant to make two five-minute calls each day, visits from material witnesses at the jail complex, and unlimited correspondence with prospective witnesses. Two days later, however, defendant complained that prison personnel were not implementing these orders. On May 14, the court received a letter from Philip Hardiman, the executive director of Cook County jail, explaining that prison regulations do not permit inmates to make free calls unless an emergency arises. Hardiman further explained that it would be impossible to serve defendant hot meals upon his return from court. Hardiman also stated that although the Department of Corrections does not permit contact visits with material witnesses, defendant was afforded unlimited correspondence with these individuals.

Based upon this letter, the court revised its earlier orders. The court ordered that telephones would be available to defendant within the parameters established by the correctional department. The court also ordered that defendant be permitted to use the phone while housed in the jury room prior to court appearances. Finally, the court issued an order requested by defendant permitting defendant to visit with specifically designated individuals at the jail.

Subsequent testimony by deputy sheriffs revealed that within the following week, defendant made at least 65 phone calls. The court then learned that defendant had allegedly phoned various females and proposed marriage to at least one. Consequently, the trial court ordered that defendant be restricted to four phone calls per court appearance. It is evident that the court afforded defendant every privilege possible and, therefore, he was not denied an effective opportunity to defend

himself by the trial court.

■■ Defendant's sixth contention is that the trial court erred in failing to enforce the service of subpoenas on three defense witnesses living in Will County. Defendant asserts that this ruling was based on the trial court's erroneous opinion that the court had no power to issue and enforce subpoenas outside of Cook County.

On June 6, 1984, midway through the trial, defendant requested the trial court to enforce service of subpoenas on three potential witnesses: Sharon Jefferson, Joe Edward, and Alexandro Garcia. The trial court refused to enforce service on these subpoenas because the "Sheriff of Cook County does not have jurisdiction to serve outside of the County of Cook." However, section 155—2 of the Illinois Criminal Code of 1874 provides:

> "Subpoenas. It shall be the duty of the clerk of the court to issue subpoenas, either on the part of the people or of the accused, *directed to the sheriff or coroner of any county of this state* ***. Any attachments against witnesses who live in a different county from that where such subpoena is returnable, may be served in the same manner as capiases are directed to be served out of the county from which they issue." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 38, par. 155—2.

We hold that the trial court erred in ruling that the court lacked jurisdiction to enforce subpoenas outside of Cook County. Section 115—2 clearly provides the trial court with jurisdiction to order service of subpoenas outside of Cook County. This court may, however, affirm the trial court's judgment on any grounds warranted. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 308, 475 N.E.2d 915.) We find that there are sufficient grounds to uphold the trial court's judgment.

■■ Supreme Court Rule 413(d)(i) requires that a defendant disclose prior to trial a list of witnesses that defendant intends to call at trial. (87 Ill. 2d R. 413(d)(i).) Failure to comply with this disclosure requirement subjects defendant to possible sanctions, including exclusion of the undisclosed witness. (*People v. McKinney* (1983), 117 Ill. App. 3d 591, 596, 453 N.E.2d 926; see *People v. Short* (1978), 60 Ill. App. 3d 640, 643, 377 N.E.2d 389.) Whether or not to impose such sanction is a matter within the court's discretion, and the court's decision will not be disturbed absent a showing by defendant of prejudice or surprise. *People v. McKinney* (1983), 117 Ill. App. 3d 591, 596, 453 N.E.2d 926.

Defendant failed to include the name of Joe Edward on his list of witnesses to be called at trial. Defendant has also failed to demonstrate surprise or prejudice by the exclusion of Joe Edward by the trial court. Therefore, it is evident that the trial court did not abuse its dis-

cretion by excluding Joe Edward as a witness to defendant's trial.

Supreme Court Rule 413(d) requires that a defendant disclose prior to trial any defenses he intends to make at trial. In an offer of proof defendant claimed that the testimony of Alexandro Garcia was relevant because Garcia would testify that he was with defendant on the day of the crime. Clearly this testimony was to substantiate an alibi defense by defendant. Rule 413(d)(iii) also requires that a defendant relying on the defense of alibi must provide specific information as to the place where he maintains he was at the time of the alleged offense. Defendant failed to disclose that he was with Garcia on the day of the crime or defendant's whereabouts the day of the crime. Therefore, the trial court was within its discretion in excluding Garcia as a witness to defendant's trial.

 █ The right to compulsory process is only available where the witness is capable of testifying to events he personally observed, and his testimony must be relevant and material to the accused's defense. (*Washington v. Texas* (1967), 388 U.S. 14, 23, 18 L. Ed. 2d 1019, 1025-26, 87 S. Ct. 1920, 1925.) In the instant case, the trial court specifically inquired into how Sharon Jefferson's proposed testimony would be relevant to the proceedings. Defendant said that Jefferson would testify about a phone conversation she had with the prosecutor. Jefferson was employed as a telephone operator at the jail facility where defendant was housed and on occasion, she connected defendant's phone calls to witnesses and other individuals. The prosecutor informed the court that he had telephoned Jefferson to warn her that it was improper for defendant to be calling the victim, Gladys Peterson, and by aiding defendant, Jefferson was potentially compounding a crime. We find that the testimony was clearly irrelevant to the determination of defendant's guilt or innocence and, therefore, the testimony was properly excluded.

 Defendant's seventh contention is that he was denied the opportunity to adequately represent himself when he was compelled to appear in jail garb during trial. In *Estelle v. Williams* (1976), 425 U.S. 501, 513, 48 L. Ed. 2d 126, 135-36, 96 S. Ct. 1691, 1697, the Supreme Court held that an accused may not be compelled to stand trial before a jury while dressed in identifiable prison clothes. However, where a defendant has ample opportunity to secure civilian clothing and then appears in court wearing jail attire, he cannot claim denial of a fair trial on this basis. *People v. Medley* (1983), 111 Ill. App. 3d 444, 448, 444 N.E.2d 269; see *Estelle v. Williams* (1976), 425 U.S. 501, 509, 48 L. Ed. 2d 126, 133-34, 96 S. Ct. 1691, 1695; *People v. Woolbright* (1979), 71 Ill. App. 3d 365, 368, 389 N.E.2d 641.

In *Medley*, defendant claimed that he had been forced to appear before the jury in jail clothing. The court noted that the defendant had an adequate opportunity to obtain civilian clothing before trial, but, instead, waited until the last moment and then requested a continuance so that he could be properly garbed. The court declared that "such behavior cannot be condoned for the wheels of justice grind slowly enough without allowing defendants to use this type of delaying tactic." *People v. Medley* (1983), 111 Ill. App. 3d 444, 448, 444 N.E.2d 269.

In the instant case, defendant similarly resorted to dilatory tactics. On May 30, 1984, immediately prior to *voir dire*, defendant appeared in court without any shoes. He claimed that he was transported to the courthouse in this condition simply because he failed to get ready quick enough to please a certain jail officer. The court admonished defendant about further delaying the proceedings and then secured a pair of shoes for defendant.

Five days later, defendant complained that he was compelled to appear in court attired in a jogging suit and shower scuffs. He argued that it was his practice to wear a jogging suit to the court facility and then change into civilian garments prior to his court appearance. On this particular day, however, defendant alleged that a prison lieutenant indicated defendant was bringing too many things to court and, therefore, defendant was required to leave his civilian clothing behind.

The trial court quizzed defendant about his inability to be appropriately garbed. The court noted that defendant had never worn these clothes on the 59 to 60 occasions he previously appeared in court. The court then ordered defendant to be appropriately dressed henceforth. It is obvious that defendant attempted to further delay court proceedings by resorting to this tactic. Defendant failed to heed the warning given to him only five days earlier and again designed a method to frustrate the judicial process. Defendant was not compelled to appear in the jogging suit. He had adequate time to properly dress prior to leaving the jail, but he failed to do so. He cannot claim error based on his own decision to wear the jogging suit.

Finally, defendant's jogging outfit cannot be considered identifiable jail clothing. In *People v. Medley*, the court stated that defendant's garb, which constituted a pale green shirt and pants similar to that worn by surgeons, hardly constituted identifiable prison garb. The court noted that there was nothing to identify the outfit as jail issue and therefore, the situation of the defendant's clothing was not nearly so egregious as prior cases. Similarly, in this instance, there is no indication that defendant's outfit was anything other than ordinary sports

clothing worn by millions of people every day. It is not clothing unique to prison institutions and, therefore, defendant cannot claim that it is equivalent to "identifiable prison clothing."

■■ Defendant's eighth contention is that statements made by the court and the prosecutor prejudiced defendant in his attempt to effectively represent himself as they implied that defendant was not represented by counsel because of his uncooperative attitude or nature. Defendant's contention is without merit. A judge should not show hostility or even impatience toward defense counsel. (*People v. Santucci* (1962), 24 Ill. 2d 93, 99, 180 N.E.2d 491.) Jurors are ever watchful of the judge's attitude, and disclosure of hostility on the judge's part toward defense counsel as it is apt to influence them in arriving at their verdict. 24 Ill. 2d 93, 98, 180 N.E.2d 491.

■■■ ■ Defendant points to two occasions where the court and the prosecutor made allegedly improper comments. During defendant's opening statement, defendant requested that he be allowed to see the Jury Instruction Handbook. The court stated that the instructions would be given at the appropriate time and that this is the time for defendant to discuss what he believes the facts are and the evidence which he intends to introduce in support of those facts. Defendant refused the court's request to proceed and apologized to the jury for not being prepared. The prosecutor objected to defendant's claim that he was not ready by pointing out that defendant had been furnished with two copies of the information; that defendant had been given four copies of the police reports; that he had every transcript of the proceedings; and that he had gone through six attorneys.

During defendant's cross-examination of Officer Mark Kaspar, defendant requested the court file in order to determine the date in which Officer Kaspar had testified earlier on a motion. The court allowed defendant to see the half-sheet from the court file and then the judge made the following statement to the jury:

> "While we are just taking a brief moment away I would like to indicate to the Jury that while the defendant has the right to represent himself, it needs to be made perfectly clear to the Jury that the rules of procedure and the rules of evidence and the protocol that is proper within a courtroom applies to the defendant whether he represents himself or whether he is represented by an attorney. These rules apply equally: that if it appears that he is under difficulty, it is his choice to proceed, his right, as we indicated to you, to represent himself, but the rules still apply to him even though he is representing himself."

Defendant objected to the court's statement and therefore asked

the court if he would be allowed to make a motion for appointment of counsel. The prosecutor objected and stated that defendant has had six attorneys. The court denied defendant's motion and stated that it was made very clear to defendant that once the trial commenced with defendant acting *pro se*, defendant would continue *pro se*.

It is evident that the court's statements in no way cast an unfavorable light upon defendant. On the contrary, the trial court showed extraordinary patience with defendant in light of his delaying tactics. During defendant's opening statement, the trial court rejected defendant's request for jury instructions which defendant already possessed. The court explained to defendant that the opening statement was not the proper point in the trial to bring up matters of law. Clearly, the court was not commenting on defendant's uncooperative nature. Similarly, during defendant's cross-examination of Officer Kaspar, the court merely explained to the jury that a *pro se* defendant, like the prosecution, must follow the rules of procedure and protocol when he is in the courtroom. This statement was a neutral statement which in no way disparaged defendant. As stated by the Supreme Court in *Faretta v. California*, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Faretta v. California* (1975), 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581-82, 95 S. Ct. 2525, 2541.

Defendant also contends that the prosecutor's two statements that defendant already had six lawyers were prejudicial to defendant. We hold that defendant's contention is without merit. A defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180.) In both instances, defendant's dilatory conduct precipitated the prosecutor's statements. During defendant's opening statement, defendant refused the court's admonition to proceed and apologized to the jury for being unprepared. The prosecutor objected to defendant's complaint that he was unprepared, and his comments to the court merely supported his contention that defendant had more than adequate time to prepare. During cross-examination, defendant requested that counsel be appointed for him. The prosecutor's statement that defendant already had six attorneys was proper in light of defendant's ambivalence on hiring counsel and the court's ruling that defendant would have to proceed *pro se* for the duration of the cause. In short, any prejudice against defendant was due to his own dilatory behavior and cannot be considered error by this court.

 Defendant's ninth contention is that the trial court denied defendant the right to an impartial jury when the court did not excuse two veniremen for cause who had informed the trial court that they were concerned that defendant had access to their addresses. Defendant also claims that the trial court erred in failing to conduct an adequate inquiry into the veniremen's fears and that the court erred in announcing to the other jurors that the addresses of the jurors would not be given to either the defendant or the prosecutor.

The right to trial by an impartial panel is so basic that a violation of that right requires a reversal. (*People v. Cole* (1973), 54 Ill. 2d 401, 411, 298 N.E.2d 705.) While impartiality is not a "technical conception," it is a state of mind which must be ascertained from statements made by the prospective jurors. (*People v. Stone* (1978), 61 Ill. App. 3d 654, 667, 378 N.E.2d 263.) A person is not competent to sit as a juror if his mental attitude is such that a defendant will not receive a fair and impartial trial with him or her as a member of the jury. (*People v. Cole* (1973), 54 Ill. 2d 401, 413, 298 N.E.2d 705.) The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror. The determination of whether or not the prospective juror possesses the state of mind which will enable him to give an accused a fair and impartial trial rests on the sound discretion of the trial court. The court's determination should not be set aside unless it is against the manifest weight of the evidence. *People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705.

 ██ In the instant case, two potential jurors indicated during *voir dire* that they had reservations about defendant's access to their home addresses. During *voir dire* questioning of Mr. Felice by the trial court, the following exchange took place:

"JUROR FELICE: *** Your Honor, may I say something, please?

THE COURT: Yes.

JUROR FELICE: There is one thing that has been troubling me since yesterday, and I just thought it over through the night, I would like to bring it out if I may. I feel that I have a problem and maybe I call it a bit of intimidation with the fact that anyone who is defending himself has direct access to the cards, the personal information about myself and my family. I only feel that it's right that I bring it out. That does bother me.

THE COURT: All right. It's also available to the State of course.

JUROR FELICE: I understand that.

THE COURT: Does this in any way cause you to feel that

you could not be fair and impartial in this matter?

JUROR FELICE: I would hope not, but I know it's bothering me and it bothered me yesterday, so I figured I better say it today before I get any further.

MR. PARTEE: Thank you very much, sir, I appreciate that honesty. Could we have a side-bar, your Honor, please?

THE COURT: In a minute."

Moments later during *voir dire* questioning of Mr. Hahnfeld by the trial court, the following exchange took place:

"JUROR HAHNFELD: Your Honor, if I may. I have the same concern as the gentleman sitting in front of me as far as my address is concerned. I feel exactly the same way that he does. I would not like my address published both to the defendant and to the counsel.

MR. PARTEE: Excuse me, your honor. I appreciate that too, sir, that you are bringing that out because a lot of people don't bring out the truth. I would simply ask if we could have a sidebar.

MR. BREDEMANN: Objection to making statements in front of the jury.

THE COURT: Sustained.

MR. PARTEE: I would ask for a sidebar.

THE COURT: We'll be having a sidebar very shortly.

MR. PARTEE: Thank you, your honor.

THE COURT: The statute provides that the jury cards that include the information that appears thereon be made available to both the State and to the defendant upon request. This is the reason for the card to be made available.

JUROR HAHNFELD: Do we have a choice in filling out that card? I ask, could we have it left off?

THE COURT: Actually, I think it's required by the statute that the information relative to the selection of a jury from throughout the county, that the information relative to the selection of a jury, that they would need to know what your address was?

JUROR HAHNFELD: Okay, I understand, from a county standpoint."

Subsequently, the court informed all of the veniremen of the panel that their addresses had been deleted from their jury cards and that neither defendant nor the prosecution had any record of the veniremen's addresses. The trial court then asked the potential jurors if the court's action had allayed the concerns of the two veniremen. The ju-

rors responded positively. After questioning other jurors, the court asked both Hahnfeld and Felice if they had an opinion as to the guilt or innocence of defendant. Both men explained that in their minds, the defendant was innocent until proven otherwise. Furthermore, the trial court asked the jurors if there was anything in their minds that would lead them to believe that they could not give a fair and impartial hearing to both the State and defendant. The jurors responded negatively.

Defendant contends that the concerns expressed by jurors Felice and Hahnfeld demonstrate bias against defendant. When fairness requires *voir dire* examination in a particular area of potential prejudice, it can be sufficient to ask a brief, general question which focuses the attention of the prospective jurors on the area of potential prejudice. (*People v. Washington* (1982), 104 Ill. App. 3d 386, 391, 432 N.E.2d 1020.) Furthermore, it is proper for a trial court to use a procedure which involves general questions addressed to the entire group and then follow up with individual questions of potential jurors who indicate they might not be impartial. (*People v. Washington* (1982), 104 Ill. App. 3d 386, 391, 432 N.E.2d 1020.) In response to the court's questioning, the two veniremen each stated that they presumed defendant to be innocent until proven otherwise. Moreover, the jurors as a whole stated that they could be fair and impartial. Considering the statements by the two veniremen and the jurors in the panel, we cannot say the judgment by the trial court was against the manifest weight of the evidence.

Defendant contends that the concerns expressed by jurors Felice and Hahnfeld may have "contaminated" the remaining members of their panel and therefore, the court erred by not interrogating these jurors regarding potential prejudicial taint. Yet, defendant fails to consider the statements made by the jurors in response to the court's questioning regarding their impartiality as to defendant and the prosecutor. The statement of a juror is proper for the court to consider as evidence of his state of mind and is to be given the weight to which it is entitled under the circumstances. (*People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705.) We hold that the trial court properly considered the jurors' statements of their impartiality.

■■ Defendant also contends that the court erred by deleting the juror's addresses from the jury cards. Section 115—4(c) of chapter 38 of the Code of Criminal Procedure (Ill. Rev. Stat. 1983, ch. 38, par. 115—4(c)) states that "upon request the parties shall be furnished with a list of prospective jurors with their addresses if known." The committee comments for this section, however, provide that "[t]he additional provision for addresses if known is for the convenience of both

parties." We hold that this provision is permissive in nature. Moreover, it is evident that the exclusion of addresses in no way prejudiced defendant.

■■ Defendant next contends that the trial court committed reversible error when it failed to inform defendant that he had one peremptory challenge to exercise during the selection of each alternate juror. The court informed defendant that defendant had utilized all 10 of his peremptory challenges during selection of the jury. Defendant claims that the court failed to inform defendant that he had one additional peremptory challenge for each alternative juror. Defendant's argument has no merit. A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure. (*McKaskle v. Wiggins* (1984), 465 U.S. 168, 185, 79 L. Ed. 2d 122, 137-38, 104 S. Ct. 944, 954-55.) Nor does the constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course. (465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944.) Thus, it is clear that a court need not inform a *pro se* defendant of the number of challenges to which he is entitled. (*People v. Davenport* (1985), 133 Ill. App. 3d 553, 558, 479 N.E.2d 15.) In short, the court owed no duty to inform defendant of the number of challenges he had.

■■ Defendant's tenth contention is that the trial court erred in allowing two State expert witnesses to testify as to their detection of genetic markers in blood because the test used, electrophoresis, has not been proved to be reliable and, therefore, should not be admitted into criminal trials. As a rule, expert testimony is admissible where the expert has knowledge or experience not common to laymen which renders his or her opinion an aid to the jury in determining a fact in issue. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208, 469 N.E.2d 569.) The recognized standard for admission of new scientific techniques was stated in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1014, as follows:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

■■ Electrophoresis "involves the application of an electrical cur-

rent to a blood sample for a period of time, thereby causing the different enzymes present in the blood to separate into their protein components. After separation, the enzymes and their protein components can be identified and, in this way, the blood can be classified more specifically than is possible by traditional A, B, O blood grouping." (*Robinson v. State* (1981), 47 Md. App. 558, 574, 425 A.2d 211, 220.) Electrophoresis has long been recognized as a reliable method of studying genetically determined differences between individuals and population. Thus, the methodology and genetic mark typing poses no issue of reliability or acceptance amongst the scientific community. Rather, the sole dispute centers on the use of electrophoresis by forensic scientists in examining genetic markers from dry stain analysis and the effect of environmental factors on typing results. Juricek, *Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 8 (1984).

We hold that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible in a court of law. *People v. Redman* (1985), 135 Ill. App. 3d 534, 537, 481 N.E.2d 1272; *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 626, 414 N.E.2d 1318; see *People v. Harbold* (1984), 124 Ill. App. 3d 363, 381, 464 N.E.2d 734; *Robinson v. State* (1981), 47 Md. App. 558, 577-78, 425 A.2d 211, 221; *State v. Washington* (1981), 229 Kan. 47, 54-55, 622 P.2d 986, 992; *State v. Dirk* (S.D. 1985), 364 N.W.2d 117, 121; contra, *People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270.

In *People v. Redman*, the court found that the use of electrophoresis to identify genetic markers was not "unreliable as a matter of law." The court relied on the testimony of Debra Fesser, who held a biology degree and had received one year of training from the Illinois Department of Law Enforcement in her specialty, serology, which is the analysis of blood and body fluids and hair and fibers. After noting that there was no objection at trial of Fesser's testimony and no objection to foundation, the court noted that the cases of *Robinson v. State* and *State v. Washington* had extensively considered the use of electrophoresis in analyzing blood and making comparisons and both, in well reasoned opinions, accepted the reliability of the electrophoretic technique. The court also relied on *People v. LaSumba*, which held that the prosecution had met its burden of showing that the use of electrophoresis to test for a genetic marker was more probative than prejudicial.

In *People v. Harbold*, this court, while reversing on other grounds, held that the electrophoretic detection of genetic markers in field con-

ditions was not unreliable as a matter of law. The court, however, found that "some questions as to scientific acceptance of the technique remain unanswered in this record and in the case law." Defendant relies on *Harbold* and an article written by Richard Jonakait to support his contention that the use of electrophoresis by forensic scientists is unreliable. We note initially that Jonakait is a lawyer and as we shall explain later, he is not qualified as an expert in forensic sciences or serology. The basic thrust of Jonakait's complaints and others is that the analysis of dried bloodstains is unreliable because blood alters from the moment it leaves the body and this aging can cause a false reading. Moreover, there are concerns that the blood will be contaminated by bacteria and other substances. Juricek, *Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 8, 9 (1984).

These concerns, however, have been recognized by forensic scientists evaluating the results of electrophoresis on dried bloodstains (Denault, Takimoto, Kwan, & Pallos, *Detectability of Selected Genetic Markers in Dried Blood on Aging*, 25 J. Forensic Sci. 479, 496 (1980)), and evaluation of these variables is considered by forensic scientists in detecting genetic markers (Sensabaugh, *Response to the Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 12 (1984)). In commenting on the reliability of results from electrophoretic tests by forensic scientists, Professor George F. Sensabaugh made the following statement:

"In summary, the evaluation process serves both to screen out potentially unreliable markers and to provide the analyst with a body of experience with each accepted marker. Of the hundred or so known genetic markers, only about a dozen have passed muster and are commonly accepted for use in casework. It should be noted that analysts as well as markers undergo evaluation. The quality assurance programs operating in most crime laboratories prevent analysts from employing a marker until they have developed the critical judgment to work with that marker. In addition, many laboratories have an established policy that typing judgments require independent assessments by two or more analysts. It is also the rule in most laboratories that typing gels are documented photographically. These safeguards are in effect to minimize risk of analyst error. The proof of the pudding in terms of typing reliability has been demonstrated in proficiency trials. *For the commonly used markers, the typing error rate is usually less than 1%.* This figure compares favorably to the error level in routine clinical laboratory practice where samples and procedures are highly standardized.

Put another way, if there were basic deficiencies either in the markers used or in the analysts using them, the proficiency test results would not be nearly so good." (Emphasis added.) Sensabaugh, *Response to the Misapplication of Genetic Analysis in Forensic Science*, 29 J. Forensic Sci. 12, 13 (1984).

In the instant case, Joe Day, who holds a degree in biology and had received 1½ years of training from the Illinois Department of Law Enforcement in his specialty, serology, testified that "when doing (electrophoresis) test(ing) we are fully aware of the type of contaminated foreign substances that will interfere, and when you have that type of interference, it gives you a very conclusive result." As to the aging process, he stated that "[i]f they're dried and frozen, they remain preserved to a great extent, and there are different degrees of freezing *** the colder the sample is frozen, the more stable the protein remains."

It should be noted that the aging process does not distort the results of electrophoresis. If the stain is too old to produce a readable genetic marker, then the results are merely inconclusive and do not result in misidentification of markers. Sensabaugh, *Uses of Polymorphic Red Cell Enzymes in Forensic Science*, 10 Clinics in Haematology 185 (1981).

■■ Dr. Mohammad Tahir, an expert in forensic serology, and Joseph Daly, an expert forensic serologist, determined through electrophoresis that bloodstains on defendant's clothing could not have originated from defendant. Moreover, both opined that these same bloodstains contained genetic markers found in the victim's blood. Defendant contends that this court consider the opinion of Dr. Emmett Harmon, an analytical chemist and an expert in serology. Dr. Harmon opined that "[o]n stains stored under the usual condition that evidence is stored after two months the data becomes doubtful." Yet, once the test results were properly admitted, the reliability of those results are considered by the jury. (*Aroonsakul v. Flanagan* (1984), 124 Ill. App. 3d 626, 632, 464 N.E.2d 1091.) It is the jury who must assign weight to the testimony of an expert witnesses in light of his credentials and the factual basis of his opinion. (124 Ill. App. 3d 626, 464 N.E.2d 1091.) In the instant case, the jury's determination is clearly supported by the record.

■■ ■ Defendant's eleventh contention is that the trial court erred by not appointing Randolph Jonakait as an expert witness for the defense to testify as to the unreliability of electrophoresis. An individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons

and where such would aid the trier of fact in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208, 469 N.E.2d 569.) A witness may be qualified as an expert by reason of knowledge, skill and experience, training or education. (*People v. Hanserd* (1985), 136 Ill. App. 3d 928, 930, 483 N.E.2d 1321.) The burden of establishing the qualifications of an expert witness is on the proponent of his testimony, and it is within the discretion of the trial court to determine whether the witness has been qualified. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208, 469 N.E.2d 569.) We hold that the trial court did not abuse its discretion by excluding Jonakait as an expert witness.

When the court questioned Jonakait's qualifications to testify on the reliability of electrophoresis, Jonakait responded that he was an associate professor of law with no medical or scientific background. Jonakait had also not received any special training, skill, or experience in testing or evaluating electrophoretic techniques. It is evident that Jonakait was not qualified to act as an expert in this instance. Moreover, we note that the court did appoint Professor Emmet Harmon, an analytical biochemist and an expert in serology, as an expert defense witness, who questioned the reliability of the electrophoresis testing in this case. Therefore, defendant suffered no prejudice by the exclusion of Jonakait as an expert witness.

Defendant's twelfth contention is that the trial court erred in failing to require Judge Crandell to appear or submit an affidavit at a hearing on defendant's third motion to substitute Judge Crandell for prejudice. Defendant's contention is without merit. On May 2, 1984, a hearing was held before Judge Kavitt to determine whether Judge Crandell should be substituted for cause. Defendant requested that Judge Crandell appear to testify before the hearing or submit an affidavit as provided for in section 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 114—5(c)). The court denied both of defendant's requests, declaring that section 114—5(c) did not require a judge to testify or submit an affidavit. The statute provides that upon motion for substitution for cause, the case shall be transferred to a "judge not named in the motion; provided, however, that the judge named in the motion *need not testify*, but *may* submit an affidavit *if* the judge wishes." (Emphasis added.)

The basic tenet of statutory construction is that the language of a statute be given its plain and ordinary meaning. (*People v. Steppan* (1985), 105 Ill. 2d 310, 317, 473 N.E.2d 1300.) Where the language is clear and unambiguous, the proper function of the judiciary is to enforce the law as enacted by the legislature. (*People v. Ellis* (1984), 128 Ill. App. 3d 180, 182, 470 N.E.2d 524.) The statutory language itself is

the best source for determining the intent of the drafters. (128 Ill. App. 3d 180, 182, 470 N.E.2d 524.) Nowhere does the statute provide that a judge must testify or submit an affidavit. Therefore, we find that the trial court was correct in ruling that the statute is merely directory.

We also find that defendant suffered no prejudice from the failure of Judge Crandell to testify or submit an affidavit. Defendant argued that the judge's testimony was necessary to respond to allegations of an *ex parte* conversation with the prosecutor. However, the prosecutor testified at the hearing and stated that no such conversation took place. We note that in three hearings, defendant failed to substantiate his charges of prejudice by Judge Crandell. Moreover, our review of the record fails to reveal any incidents which demonstrate prejudice by Judge Crandell.

██ Defendant's thirteenth contention is that the trial court denied him a fair trial when it refused his instructions on simple battery and attempted robbery. We hold that ample evidence established that a dangerous weapon was used to cause great harm and permanent disfigurement to the victim, and, thus, no rational jury could have found defendant guilty of simple battery and attempted robbery. A defendant is only entitled to an instruction of the lesser-included offense where the jury could rationally acquit him of the greater offense, but convict him on the lesser offense. (*People v. Wolfe* (1983), 114 Ill. App. 3d 841, 854, 449 N.E.2d 980.) Therefore, where the evidence is sufficient for a conviction on the greater offense, it is not reversible error to instruct only on that offense. *People v. Zipprich* (1986), 141 Ill. App. 3d 123, 127, 490 N.E.2d 8.

In the instant case, the evidence is undisputed that the victim sustained multiple lacerations to her neck and face which resulted in permanent scarring. The victim's treating physician, Dr. Pawlikowski, testified that the instrument that caused these injuries was capable of causing death. It is evident that a jury could only rationally conclude that defendant was armed with a dangerous weapon and that the victim's injuries constituted both great bodily harm and permanent disfigurement.

██ ██ Defendant's fourteenth contention on appeal is that his conviction for attempted armed robbery should be reduced to attempted robbery and his conviction for aggravated battery should be reduced to battery because the State failed to prove beyond a reasonable doubt that he used a weapon during the incident.

It is settled that the State, as one element of the offense of armed robbery, must prove beyond a reasonable doubt that a robbery was

committed while defendant carried or was otherwise armed with a dangerous weapon. (*People v. Meadows* (1981), 92 Ill. App. 3d 1028, 1031, 416 N.E.2d 404; Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a).) The use of a dangerous weapon can be inferred from circumstantial evidence. (*People v. Meadows* (1981), 92 Ill. App. 3d 1028, 1031, 416 N.E.2d 404; *People v. DuPree* (1979), 69 Ill. App. 3d 260, 264, 387 N.E.2d 391.) The parameters of what constitutes a dangerous weapon have been left primarily to judicial construction. (*People v. Skelton* (1980), 83 Ill. 2d 58, 414 N.E.2d 455.) Circumstantial evidence is sufficient to prove that a defendant was armed while committing an offense, even if no weapon was seen at the time of the offense. *People v. Grant* (1982), 104 Ill. App. 3d 551, 555, 432 N.E.2d 1200; *People v. DuPree* (1979), 69 Ill. App. 3d 260, 264, 387 N.E.2d 391; *People v. Rice* (1969), 109 Ill. App. 2d 391, 395, 248 N.E.2d 745.

■■ Here, there was sufficient evidence for the trial court to find that defendant used a dangerous weapon during his crime. Testimony by Dr. Pawlikowski indicates that the victim suffered lacerations to her face and neck up to two inches in length. She also suffered a puncture wound to the neck, 1½ inches in depth, and a laceration of the ear canal. Dr. Pawlikowski stated that the victim was required to undergo surgery due to these wounds and that she now suffers permanent scarring. Dr. Pawlikowski opined that in light of the victim's many injuries, defendant was armed with a cutting instrument at the time of the crime.

This case is similar to that of *People v. Rice* (1969), 109 Ill. App. 2d 391, 248 N.E.2d 745, in which this court found the existence of a weapon was inferred from circumstantial evidence that the victim's throat had been cut during the assault, even though the victim himself did not see a weapon and no weapon was recovered.

The cases cited by defendant as in support of his contention that the State failed to prove he used a dangerous weapon to commit his crime are without merit. In *People v. Binion* (1967), 80 Ill. App. 2d 130, 225 N.E.2d 485, and in *People v. Taylor* (1972), 3 Ill. App. 3d 313, 278 N.E.2d 469, while the victims were beaten and kicked by their assailants, their injuries gave no indication that they had been assaulted by any type of dangerous weapon. We hold that there was sufficient evidence for the trial court to find that defendant used a dangerous weapon to inflict injury upon the victim during the commission of the instant offense.

■■ Defendant's fifteenth contention on appeal is that he was denied his right to an impartial jury where the State allegedly used its peremptory challenges to systematically exclude black veniremen. The

State argues in reply that defendant's argument lacks merit and that defendant has failed to make a *prima facie* showing that the sole reason for the prosecutor's exclusion of several veniremen was their race.

In the recent case of *Batson v. Kentucky* (1986), 476 U.S. 79, 96-97, 90 L. Ed. 2d 69, 87-88, 106 S. Ct. 1712, 1722-23, the Supreme Court held that a defendant in a State criminal trial could establish a *prima facie* case of racial discrimination based upon the prosecutor's use of peremptory challenges to strike members of the defendant's race from the venire. Once the defendant had made the *prima facie* showing, the burden shifted to the prosecutor to come forward with a neutral explanation for those challenges.

In *Griffith v. Kentucky* (1987), 479 U.S. ___, 93 L. Ed. 2d 649, 107 S. Ct. 708, the Supreme Court directed that its decision in *Batson v. Kentucky* be applied retroactively to cases on direct appeal.

To establish a *prima facie* case, the *Batson* court found a defendant must first show that he is a member of a cognizable racial group. Second, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits discrimination. Third, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used his peremptory challenges to exclude certain veniremen from the petit jury on account of their race. A pattern of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of a discriminatory purpose.

In *Batson*, the petitioner, a black man, challenged the prosecutor's acts at trial whereby the prosecutor exercised his peremptory challenges to dismiss all four black veniremen, thus selecting an all-white jury. Similarly, in *Griffith*, one black petitioner, Griffith, appealed from the proceedings in the State trial court during which the prosecutor used four of his five peremptory challenges to strike four of the five black veniremen. The remaining black venireman was removed from a random draw, causing no black person to remain on the jury. Despite the request made by defendant's counsel, the prosecutor refused to state his reasons for exercising his peremptory challenges against the four black veniremen. Petitioner Brown, a second petitioner in *Griffith*, also black, appealed from the State court jury selection in which all six black veniremen were excused from the first panel, four were excused by the court and two by the prosecutor's use of peremptory challenges. As the second panel was assembled, the prosecutor reportedly called the jury clerk and told her that he would like as few

black jurors as possible in the additional venire.

In the case at bar, by comparison, the record fails to reflect the final racial composition of the jury, the race of the venire, or the race of the eight veniremen excused by the prosecutor. Defendant's self-serving statement that the prosecutor used every one of his peremptory challenges to excuse five black veniremen is not verified in any way in the record. Moreover, we note that defendant remarked during the instruction conference, "[W]e have a practically all-white jury, eleven white jurors on this thing," giving this court good reason to believe that black veniremen were not systematically excluded. Defendant's inability now to present a *prima facie* showing that the prosecutor used his peremptory challenges to exclude the black veniremen from the petit jury indicates that upon remand he would be equally unsuccessful. (See *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1085 (wherein this court held that where the appellate record reflects that defendant cannot make an affirmative showing as required in *Batson* on remand, such issue must be considered waived).) We find that defendant's contention that this case be remanded for a *Batson* hearing is without foundation.

Defendant's sixteenth contention on appeal is that the trial court erred when it prevented defendant from asking his expert witnesses relevant questions concerning the victim's injuries and the bloodstains on the defendant's clothing. Specifically, defendant maintains that he was prevented from eliciting testimony from his expert witnesses regarding two key issues in his case, the reliability of electrophoretic analysis and the question of whether defendant used a dangerous weapon during the incident.

The reception or exclusion of evidence is within the province of the trial court, and a reviewing court will not interfere absent an abuse of discretion prejudicial to defendant. (*People v. Thomas* (1979), 72 Ill. App. 3d 186, 201, 389 N.E.2d 1330.) The trial court has the power to exclude cumulative or repetitive testimony; the extent to which cumulative evidence may be received rests within the discretion of the trial court. *People v. Frazier* (1984), 129 Ill. App. 3d 704, 711, 472 N.E.2d 1183.

Here, defendant claims that the trial court erred in denying him the opportunity to question Dr. Hicks as to whether he thought the victim had been slashed with a cutting instrument. Defendant maintains that his objective was to rebut the State's contention that he had used a dangerous weapon during the incident. However, defendant had already elicited from Dr. Hicks his opinion that something other than a dangerous weapon might have caused the victim's injuries and that

defendant probably did not have a knife in his hands at the time of the criminal act. Thus, Dr. Hicks' answer to defendant's additional question regarding whether a cutting instrument was used would have been merely cumulative.

Similarly, Harmon's response to defendant's questioning regarding whether the preservation of a bloodstain is affected by the type of fabric in which it is absorbed was properly excluded as cumulative testimony. Prosecution expert Joseph Day had previously acknowledged that one factor affecting analysis of bloodstains was the type of fabric involved. Day testified that bloodstains absorbed into polyester rather than cotton fabric were harder to extract. Moreover, it is noted that Harmon had answered defendant's question before the trial court could sustain the State's objection, allowing the jury to hear Harmon's answer to defendant's question. Thus, we find that defendant was not prejudiced by the trial court's action in either instance.

■ Defendant's seventeenth contention on appeal is that he should have been convicted and sentenced for only one count of aggravated battery because the three counts of aggravated battery charged arose from one continuous physical act.

In *People v. King* (1977), 66 Ill. 2d 551, 565, 363 N.E.2d 838, the seminal case involving multiple convictions carved from a single physical act, the court found that prejudice results to a defendant only in those instances where more than one offense is carved from the same physical act. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant had committed several acts, despite the interrelationship of those acts. The *King* court held that the word "act," when used in this sense, was intended to mean any overt or outward manifestation which would support a different offense.

The Illinois Supreme Court further clarified its finding in *People v. Dixon* (1982), 91 Ill. 2d 346, 355-56, 438 N.E.2d 180. In *Dixon*, where defendant, a prison inmate, repeatedly struck another inmate with a club or broom handle during a prison uprising, the supreme court found that such separate blows, even though closely related, were not one physical act.

In *People v. Jones* (1984), 128 Ill. App. 3d 842, 846, 471 N.E.2d 590, this court found that defendant was properly convicted of four separate counts of aggravated battery and one count of armed violence where he stabbed the victim four times in the hand during the course of an armed robbery. In *People v. Smith* (1983), 114 Ill. App. 3d 1007, 1017-18, 449 N.E.2d 912, this court upheld defendant's conviction on four counts of aggravated battery where defendant struck the victim

in the head and face several times with a piece of exercise equipment during a robbery attempt. Similarly, in *People v. Post* (1982), 109 Ill. App. 3d 482, 492, 440 N.E.2d 631, we found that defendant was properly convicted of four counts of aggravated battery where he stabbed the victim once in the back and three times in the thigh as the victim fell during a scuffle between the youths. Citing *People v. Mays* (1980), 81 Ill. App. 3d 1090, 401 N.E.2d 1159, in which the defendant shot his victim three times in succession and was convicted of aggravated battery causing great bodily harm, aggravated battery causing permanent disability, and aggravated battery using a deadly weapon, we found in *Post* that there were also four distinct acts of stabbing, each requiring proof of a different element—aggravated battery using a deadly weapon, aggravated battery causing great bodily harm, aggravated battery causing permanent disfigurement, and aggravated battery causing permanent disability. See also *People v. Tanner* (1986), 142 Ill. App. 3d 165, 491 N.E.2d 776; *People v. Nelson* (1985), 130 Ill. App. 3d 304, 474 N.E.2d 23; *People v. Mueller* (1985), 130 Ill. App. 3d 385, 474 N.E.2d 434.

Here, defendant's assault on the victim constituted multiple acts, a laceration to the neck and face, a puncture wound to the neck, and a laceration of the ear canal. Each injury constituted an independent offense and was caused by a separate physical blow. Thus, contrary to defendant's contentions, these offenses were not based upon the same act but were each separate and distinct. Accordingly, we find that defendant's convictions on three counts of aggravated battery are proper.

Defendant points to the case of *People v. Baity* (1984), 125 Ill. App. 3d 50, 53, 465 N.E.2d 622, wherein this court adopted a narrow interpretation of *People v. King* and held that the defendant's act in shooting his wife three times in rapid succession constituted a single act warranting only one conviction. *Baity* is distinguishable from the instant case in that here defendant caused three separate and distinct injuries during his struggle with the victim, which lasted several minutes. Thus, *Baity* is not dispositive of this issue.

■■■ Defendant's eighteenth contention on appeal is that his extended-term sentences for aggravated battery were improper because he was also convicted of attempted armed robbery, a more serious offense. The State concedes this argument.

Attempted armed robbery is a Class 1 felony (Ill. Rev. Stat. 1983, ch. 38, pars. 84—4(c)(2), 18—2(b)), while aggravated battery is a Class 3 felony (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(e)). An extended-term sentence can only be imposed for the conviction within the most seri-

ous class of offenses which a defendant has been convicted of committing. (*People v. Jordan* (1984), 103 Ill. 2d 192, 205-06, 469 N.E.2d 569.) Since defendant was convicted of attempted armed robbery, aggravated battery was not the most serious offense of which defendant was convicted. Thus, defendant's 10-year extended terms for aggravated battery were improper.

Pursuant to *People v. Jordan,* we reduce defendant's sentence to the maximum allowed by statute, a term of five years. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1.

■■■ Defendant's nineteenth argument on appeal is that his consecutive sentences for aggravated battery are improper. Section 5—8—4(a) of the Unified Code of Corrections specifies when consecutive sentences may be imposed:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively." Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(a).

Thus, in instances where the crimes have not arisen from a single course of conduct, consecutive sentences are proper. In issue eighteen above, we found that defendant's aggravated battery convictions were not part of a single physical act but, rather, were separate offenses, each warranting a separate sentence. Thus imposition of consecutive sentences was not improper.

Moreover, there was a substantial change in defendant's criminal objective during the incident. Testimony by the victim at trial establishes that when defendant first approached the victim, he told her "This is a robbery." However, when the victim refused to give defendant her money and pushed defendant, he began to struggle with her and to beat her. Defendant later ordered the victim to lie down on the car seat, whereupon he struck her in the throat. Thus, defendant's objective changed from robbery to an unwarranted physical attack on the victim.

In addition, defendant was properly given consecutive sentences, as the statute authorizes consecutive sentences where one of the offenses of which defendant is convicted is a Class 1 felony and the defendant inflicts severe bodily injury. Here defendant was convicted of attempted armed robbery, a Class 1 felony. He also inflicted severe bodily injury on the victim which necessitated surgery and caused per-

manent scarring and disfigurement to the victim. Accordingly, we find that consecutive sentences were proper.

■■ ■ Defendant's twentieth contention on appeal is that his sentence, which is to run consecutively with a prior 30-year sentence in Du Page County for armed robbery, should be modified to run concurrently. In imposing a sentence, the trial court has wide discretion. (*People v. Stambor* (1975), 33 Ill. App. 3d 324, 325, 337 N.E.2d 63.) Appellate review of sentencing is limited; in the absence of an abuse of discretion, the sentence may not be altered. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.) Section 5—8—4(b) of the Unified Code of Corrections provides as follows:

> "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(b).)

Here, evidence presented at defendant's sentencing hearing indicates that defendant was convicted of two separate armed robberies in 1973, which he committed within 24 hours of each other. Defendant was subsequently convicted of another armed robbery in 1983, for which he was sentenced to 30 years' imprisonment. While released on bail in the 1983 case, defendant committed the instant crime. Evidence was also considered regarding the victim's injuries here. The victim suffered lacerations to her face and throat and ear canal, requiring surgery and resulting in permanent disfigurement.

Defendant's prior criminal record and evidence of his propensity toward violence demonstrate that the term imposed by the trial court is required to protect the public from his further criminal conduct. We find there is no evidence that the trial court abused its discretion in imposing consecutive sentences. Defendant's lengthy sentence is justifiable.

Defendant's final contention on appeal is that the trial court abused its discretion when, during the sentencing hearing, it refused to consider in mitigation the transcript from defendant's 1983 conviction for armed robbery in Du Page County.

■■ ■ The factors controlling the admissibility of evidence at a sentencing hearing are relevance and reliability. (*People v. Perez* (1985), 108 Ill. 2d 70, 86, 483 N.E.2d 250; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65, 461 N.E.2d 347.) A reasoned judgment as to the

proper sentence to be imposed depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

■■■ Here, defendant apparently wished to establish that he had suffered from some type of mental disorder which interfered with his judgment. Defendant cites no authority for his proposition that a sentencing judge should consider facts and circumstances bearing upon a defendant's mental state at the time of a prior crime and conviction when imposing sentence on the instant crime. Moreover, defendant's claims that he suffered previously from an alleged mental disorder were not relevant to the instant sentencing proceeding as defendant did not allege that he continues to suffer from such mental disorder. Furthermore, any such mitigating factor would have been fully considered by the Du Page County court in imposing its sentence for defendant's 1983 conviction. Accordingly, the trial court properly refused to consider the 1983 trial transcript.

For the reasons set forth above, we reduce defendant's extended-term sentences for aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(e)) to the maximum allowed by statute, five years (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1). We affirm the circuit court's judgment as to defendant's convictions and the remainder of defendant's sentence.

Affirmed, except the extended-term sentences for aggravated battery are modified to five years.

SCARIANO, P.J., and BILANDIC, J., concur.